HENRY MATHEWSON, RESPONDENT AND APPELLANT, *v.* JOHN H. CLARKE, ADMINISTRATOR OF WILLARD W. WETMORE, APPELLEE.

Although a new member cannot be admitted into a partnership without the consent of all parties, yet a person who has obtained a share in the concern can, after the partnership has expired, maintain a suit in chancery for his share of the profits.

The language of the complainant in his bill, " that he became interested in a ship and cargo at and from Gibraltar," is decisive of the question when his interest commenced, and shows that he had no interest until she arrived at Gibraltar.

Where a master and supercargo was to receive a certain sum per month as wages, and a commission of five per cent., and also one tenth of all the profits, and it was agreed that these were to be in full of all services and privileges, the master and supercargo had no right to traffic upon his own account, for his own benefit.

If the master and supercargo, after the loss of his first vessel, charters another and uses the capital of his partners in prosecuting his trade, informing his owners thereof and expressing his willingness to continue the business upon the same terms as before, to which they did not object, such continuance of the business must be governed by the same rules which regulated the transactions in the first ship.

THIS was an appeal from the Circuit Court of the United States for the District of Rhode Island.

The record was very voluminous, being a printed volume of more than five hundred pages, which contained numerous letters and accounts relating to trading voyages to different and distant parts of the world, from October, 1820, to November, 1826. There were three reports from masters in chancery in the court below, and a supplemental report made to this court by agreement of counsel and sanction of the court. The arguments of counsel referred to a great number of these transactions, of which it is impossible to give any other than a general outline.

In the year 1820, there were in Providence, Rhode Island, two mercantile houses, one known by the name and firm of Edward Carrington & Co., and the other by that of Cyrus Butler. The house of Edward Carrington & Co. was composed of Edward Carrington and Samuel Wetmore.

In October, 1820, these two houses made the following agreement with Henry Mathewson, the present appellant.

" This agreement witnesseth : That whereas Messrs. Lynch, Hill, & Co., of the republic of Chili, have contracted and agreed with his Excellency, General San Martin, commander-in-chief of said republic, to furnish to him, or said government, a quantity of military stores, which contract has been assigned to Cyrus Butler and Edward Carrington & Co., who have undertaken to furnish the same. Wherefore the said Cyrus Butler and Edward Carrington & Co. on the one part, and Captain Henry Mathewson on the other part, all of Providence, in the

State of Rhode Island, on the 12th day of October, A. D. 1820, make and enter into the following agreement and stipulations, viz. : —

" 1st. The said Henry Mathewson agrees to take the command of the ship or vessel the said Butler and Carrington & Co. shall provide for said expedition, and at all times to act as captain and supercargo thereof.

" 2d. The said Mathewson is to proceed to Europe, attend to the purchase of said military stores, proceed therewith in said ship to Chili and Peru, deliver the same, receive the payment therefor, and do all and every thing that may be necessary and advisable for the faithful accomplishment of said contract, both as regards the delivery of the military stores and the receiving the payment therefor, whether the said payments shall be in cash or in produce of the republics ; and with the said payments, proceed to such ports in China. Europe, or the United States as may be considered most advantageous, and according to the instructions and recommendations of said Butler and Carrington & Co. Providing, further, that should any circumstance have occurred, or should occur, to prevent the contract being complied with on the part of the Chilian or Peruvian government, or by General San Martin or his successor, then the said Mathewson is to use his best abilities and exertions to dispose of said military stores in the most advantageous manner, and to [the] best profit ; and the proceeds of such sale embark on board said ship, and proceed therewith to such ports in China, Europe, or the United States as may be considered most advantageous, and according to the recommendations and instructions of said Carrington & Co. and C. Butler.

" 3d. The said Butler and Carrington & Co., on their part, promise to allow and pay the said Mathewson fifty dollars per month, as wages as navigator and master of the ship, and also the sum of seven hundred dollars as commission for attending and procuring the purchase of said military stores in Europe, for delivering and making the sale of the same in Chili or Peru, receiving the payment either in cash or produce of the republics, and delivering the same in China, Europe, or the United States, — he conforming always to the instructions and recommendations of said Butler and Carrington & Co. The said Mathewson is to have allowed him all travelling expenses and charges that attach to business.

" It is further mutually agreed between the aforesaid parties, that after delivering or depositing the proceeds of the aforesaid military stores, and completing and finishing the aforesaid agreement, according to the tenor thereof, a new voyage and adventure is to be begun in the following manner : —

" 1st.. The said Henry Mathewson is *then* to be admitted an owner in said ship of one tenth part, at the rate of her first cost in the United States, including repairs on hull, sails, and rigging, that may be put on her after her purchase, either in [the] United States, Europe, or elsewhere ; and also owner of one tenth part of her cargo, on such new voyage and adventure.

" 2d. Said Butler and Carrington & Co. agree to sell said Mathewson, and he agrees to purchase, one tenth of the ship, on the terms heretofore described in article first.

" 3d. Said Cyrus Butler and E. Carrington & Co. agree to furnish the sum of fifty thousand dollars (as a cargo for said ship) at the port where the said ship shall deliver and deposit the proceeds of said military stores.

" 4th. The said Mathewson is to allow said Butler and E. Carrington & Co. interest, at the rate of six per cent. per annum, for his one tenth of ship and cargo, from the time the proceeds of the military stores (heretofore mentioned) are delivered or deposited in manner as heretofore stipulated.

" 5th. The said Mathewson is, in this new voyage, to have liberty to proceed to such ports, countries, and places, backward and forward, for trade, freight, or other employment of the ship and cargo, as he may think most for the interest and advantage of the concern in said ship and cargo.

" 6th. In this new voyage, as before described, it is mutually agreed, the said Mathewson shall have fifty dollars per month, as wages as commander and navigator of said ship, to commence with the new voyage, and as supercargo a commission of five per cent. on the net amount [of] all property safely *returned* to the United States, Canton, or Europe, proceeding from the original stock of fifty thousand dollars, together with one tenth of all the profits and earnings made in the voyage or voyages, freights or otherwise.

" 7th. It is agreed that the wages and commissions specified and agreed for in the sixth article are to be in full of all services and privileges to Captain Mathewson, as master and supercargo during the voyage or voyages heretofore specified or otherwise.

" It is understood, the said Mathewson is to have no privilege in the first voyage heretofore specified, and that the wages and commissions of seven hundred dollars allowed on that voyage are to be paid in the United States at the end of voyage.

(Signed,)  CYRUS BUTLER,
EDWARD CARRINGTON & Co.,
HENRY MATHEWSON."

In pursuance of this agreement, Mathewson repaired to

Europe, and in December, 1820, at the Texel,. received the ship Mercury and her cargo from the other parties. He also received two. sets of instructions, one genuine, and the other fictitious, to be used in case of capture. The true instructions commenced in this way : —

"*Providence*, *November* 13, 1820.

" CAPT. HENRY MATHEWSON:

" Sir, — We herewith hand you the letter of Messrs. Lynch, Hill, & Co., of Valparaiso, to Edward Carrington & Co., under date of June 15, 1820, accompanied with a contract made by their Mr. Lynch with General San Martin, commander-in-chief of the Chilian and Peruvian armies, and in behalf of said government. You will observe, on perusal of the letter and contract, that the muskets, carbines, and sabres, expressed in the first article in the contract, are to be furnished by Lynch, Hill, & Co. themselves, and that the same articles mentioned in the second article are the ones intended to be supplied by ourselves, and are the same as we directed to be purchased by yourself in Europe, viz. : —

> 20,000 muskets, of good proof.
> 7,000 carbines.
> 7,000 cavalry sabres.

" The prices, you will observe, are stipulated at eight and a half dollars for the muskets, six dollars for the carbines and cavalry sabres, to be imported into Peru free of duties, and the proceeds, or payment for the same, is also allowed to be exported free of duties. The delivery of the said arms to be at any one port in Peru in possession of the patriots under General San Martin, or where, on your arrival at any one of said ports, General San Martin may determine, on the coast of Peru. You will observe the contract provides that any articles, the produce of Peru, may be received in payment (at the current market price) for the arms; always by the agreement and consent of both contracting parties, and that the same may be exported free of duties. You will also observe, that the *duties* on the import of any *other* articles of merchandise by said Lynch, into the port of Peru, are to be admitted towards the payment of the said arms. You will also observe it is understood, that, if the payment is made in specie for said arms, it is permitted to be exported free of duties."

The instructions then proceeded to tell him how to arrange his cargo, what to do when he got to Valparaiso, and continued thus : —

" In the execution of this business it will require your best

11 *

attention and circumspection to weigh well all points and circumstances, and, in conjunction with Lynch, Hill, & Co., pursue that course best calculated to have the contract complied with, taking care at the same time, as much as possible, to have the payment therefor placed under favorable circumstances; or if circumstances should have occurred to defeat the expedition, and with it destroy the hope of having the contract complied with, you are then to adopt the next best plan to make the sales of our property to the best advantage. If the contract is complied with by General San Martin, we should recommend your fully loading the ship with copper, (taking the same as payment towards the arms, particularly as it is to be allowed export free of duties); and taking copper may facilitate and help the government, and be the means of getting payment before the expiration of the eighty days limited in the contract, and taking the balance in specie, and proceed immediately to Canton; or if the contract is not complied with, and you should make the sale in Chili, or other place where copper can be procured at not exceeding fifteen or sixteen dollars the quintal on board, we should then also recommend your loading with copper, particularly if it should aid you in making sales of the arms; and then taking the balance in specie, and proceed direct for China. After having disposed of the arms, and obtained the payment for the same, it will be of much importance that you reach China as direct, and with as little delay, as possible. In order that a second deposit may be had for the property, and that a new voyage may be begun anew, without any regard to the present one, after reaching Canton you will deliver all our property to Messrs. S. Russell & Co., except the fifty thousand dollars, which you are to retain as a capital for the ship in any future operations you may think it advisable to undertake, either by trading or freighting, according as you think most profitable for all concerned; perhaps a cargo from China for Chili or Peru may be a good investment. However, after you get to Canton, and take the fifty thousand dollars as a capital, you must be your own master, and do that which is best."

The instructions then proceeded to provide for many contingencies, and concluded with a general reference to conversations between the parties before Mathewson left the United States.

The fictitious instructions provided entirely for a trading voyage to Columbia River, thence to Canton, &c.

In April, 1821, having purchased a cargo of arms, Mathewson sailed from Bremen, in the ship Mercury, for Valparaiso, and arrived there in August of the same year.

From Valparaiso he went to Lima, where he arrived in September.

On the 1st of June, 1821, a transaction occurred at Providence which was the basis of this litigation. Willard W. Wetmore (and his administrator, the present defendant in error) claimed to have been admitted on that day as a partner in the firm of Edward Carrington & Co., and the following entry upon their books was produced upon the call of the defendant Mathewson.

"Providence, June 1st, 1821.

Day-book.

Edward Carrington & Co. — New concern.

Edward Carrington $\frac{3}{8}$,
Samuel Wetmore $\frac{3}{8}$,
W. W. Wetmore $\frac{2}{8}$."

And commencing on the first page, under date of 1st June, 1821, and continuing through several pages, Edward Carrington & Co., old concern, are credited with the sum of $118,987.32, for their interest in various adventures and shipments then outstanding.

The corresponding leger is headed, "New concern, leger A," and commences with the same date.

Let us return to the voyages of Mathewson.

At Lima he sold his cargo of arms, and was detained there nearly ten months waiting for payment from the Peruvian government.

In June, 1822, having chartered the Mercury, at Lima, to a person by the name of Rodolpho, he sailed with the proceeds of the arms for Gibraltar, by way of Rio de Janeiro, and arrived at Gibraltar in November, 1822.

In December, 1822, he sailed from Gibraltar, on a trading and freighting voyage, with freight and merchandise for the joint account of the owners.

Arrived at Rio, February, 1823.
Sailed from Rio, February, 1823.
Arrived at Valparaiso, April, 1823.
Arrived at Callao, July 1, 1823.
Left Callao, September, 1823.
Arrived at Arica, October, 1823.
Left Arica for Callao, October 25, 1823.
Arrived at Callao, December, 1823.
Sailed from Callao for Canton, January 1, 1824.
Arrived at Canton, April 10, 1824.
Left Canton for South America, July 11, 1824.

Arrived at Monterey, October 25, 1824.

Left Monterey for Mazatlan, January 1, 1825.

Arrived at Mazatlan, January 21, 1825.

Left Mazatlan for Lima, March 20, 1825. Arrived at Guayaquil, June 3, 1825, where the ship, being injured in a gale and decayed by age, was condemned and sold.

On the 12th of September, 1825, Mathewson embarked at Guayaquil with goods and money for Lima, in the steamboat Tilica, which was blown up and destroyed on the passage.

In November, 1825, being at Lima, Mathewson chartered three fourths of the ship Superior. He claimed to do this upon his sole responsibility and risk, and therefore to be entitled to all the profits, allowing to Butler, Carrington & Co. only the interest upon such portion of the partnership funds as were invested in the adventure.

In November, 1825, he sailed from Lima to Canton, where he arrived in March, 1826. Leaving there in June, he returned to Valparaiso, where he arrived in October, and consigned all his property, individual as well as joint, to Alsop, Wetmore, & Co., who sold it at a large profit.

In June, 1827, he arrived in Providence, having been absent nearly seven years.

During all these voyages, Mathewson claimed to have received sums of money for himself upon various accounts; such as presents and gratuities from the persons with whom he dealt; from Spaniards for assisting in concealing their money; a deposit from a man named Martinez, to be invested in military clothing for him at Gibraltar, but who could never afterwards be found or heard of; from passengers for taking care of their money; presents from several persons for transporting specie from the shore without full duties; and profits upon all these sums, invested upon his own account in articles of trade sold and reinvested from time to time, paying freight for the same.

In 1830, Willard W. Wetmore, of New Haven, in Connecticut, filed a bill on the equity side of the Circuit Court of the United States for the District of Rhode Island against Mathewson, claiming to have been admitted by Edward Carrington & Co. as a member of their firm in June, 1821, and calling upon Mathewson to render an account of his agency as master and supercargo of the ship Mercury, on a voyage by him prosecuted before he became part owner of said ship; and of his agency as master, supercargo, and part owner of said ship and her cargo after he became a part owner; and also of his employment of the funds of the owners of the Mercury, after her condemnation and sale, in the ship Superior, three fourths of which he

chartered at Lima in November, 1825. The bill also called for a discovery of all his transactions during the adventures.

This bill was afterwards amended by the insertion of the following clause after the claim to have been admitted as a partner in June, 1821, viz. : — " (*amendment* — and then and there became the assignee and purchaser of one fourth of nine twentieth parts of said ship Mercury and her cargo and of one fourth of nine twentieth parts of all the rights *of all the rights* of said Edward Carrington & Co. in and to said contract with the said Mathewson, and, as such, entitled to a discovery and relief against the said Mathewson)."

In September, 1830, Mathewson filed his answer, to which exceptions were taken, and in February, 1831, filed a further answer. In these answers he denied that the complainant ever was a partner in the house of Edward Carrington & Co., or that he ever had any interest in the ship Mercury and cargo, or in the concerns of said adventure. The answers then went into a minute detail of all the transactions which had occurred during all these voyages, and had annexed to them a hundred and seven accounts with different persons, explaining the shipments, sales, freights, purchases, remittances, &c., &c. ·

At November term, 1831, the cause was referred to Samuel Eddy, as master in chancery, " to take and state an account between the complainant and the defendant, Henry Mathewson, touching and concerning the concerns and business of the partnership subsisting between the parties in said cause, and all the other matters and things charged in said bill of complaint."

At June term, 1832, Samuel Eddy, Richard K. Randolph, and John H. Ormsbee were appointed masters under the above interlocutory decree.

In 1834, whilst the cause was pending before the masters, Wetmore, the complainant, died, and letters of administration upon his estate were granted to John H. Clarke, a citizen of Rhode Island, the laws of that State not permitting a person residing out of the State to become the administrator of a citizen thereof. Clarke, the appellee in the case now before the court, filed a bill of revivor. Mathewson appeared, and moved to dismiss the suit on the ground of want of jurisdiction, inasmuch as the administrator and respondent were citizens of the same State. The Circuit Court dismissed the bill; but the cause being brought up to the Supreme Court, this judgment was reversed, and the cause remanded for further proceedings. The report of this case will be found in 12 Peters, 164.

In January, 1839, Charles F. Tillinghast was appointed a third master, in the place of Samuel Eddy, to act in conjunction with the other two.

In November, 1840, the masters made a very elaborate report to the court, accompanied by numerous depositions, in which report they found a balance due from Mathewson to the administrator of $ 8,098.52. To this report Mathewson filed twenty-six exceptions.

At June term, 1841, the master's report was referred back to the same masters, to reëxamine and review and reconsider the same, with liberty to either party to introduce further evidence; the plaintiff to have leave to amend his bill, and the defendant to file his answer to the amendment within twenty days. Whether or not it was at this stage of the proceedings that the plaintiff amended his bill by inserting the part included within brackets, as set forth in the preceding part of this statement, the record does not show. But on the 9th of September, 1841, Mathewson filed a further answer, denying that Wetmore was or ever had been a copartner in the firm of Edward Carrington & Co.; denying that he, Wetmore, had ever asked an account from the defendant previously to filing the bill, and denying that Wetmore had ever been admitted by the defendant as a copartner in said ships and adventures in any manner whatever.

At November term, 1841, the masters made their second report, finding a balance due by Mathewson to Clarke, as administrator, of $ 8,568.52. This report was accompanied by a great mass of additional evidence. To this report Mathewson filed twenty-four exceptions.

At the same term, viz. November, 1841, the court ordered this report of the masters, so far as respected the matters in the sixteenth exception, to be referred back to them for further inquiry.

In conformity with this order, the masters filed a third report correcting the preceding one by making an additional allowance, and reporting the entire balance due by Mathewson to be $ 8,685.66$\frac{2}{10}$.

At June term, 1842, Mathewson filed six exceptions to this third report.

At November term, 1842, the following decree was made by the Circuit Court, viz. : —

"This cause came on to be heard upon the report of the masters made in this cause at the November term, A. D. 1840, of this court, and upon the exceptions filed thereto; and upon the report of the masters made in this cause at the November term, A. D. 1841, of this court, and the exceptions filed thereto; and upon the masters' report in this cause, filed in the clerk's office of this court on the 11th day of April, A. D. 1842, and the exceptions filed thereto, and counsel being heard thereon:

"In consideration whereof, it is ordered, adjudged, and decreed, that the exceptions to the first-mentioned report be disallowed, and that the said report do stand and be confirmed, except so far as the same is altered by the report aforesaid made to the November term, A. D. 1841, of this court, and the report aforesaid filed in the clerk's office of this court on the 11th day of April, A. D. 1842.

"It is further ordered, adjudged, and decreed, that the exceptions to said report, made at the November term, A. D. 1841, of this court, be disallowed, and that said report do stand and be confirmed, except so far as the same is altered by the said report, filed in the clerk's office of this court on the 11th day of April, A. D. 1842.

"It is further ordered, adjudged, and decreed, that the exceptions to the said report, filed in the clerk's office of this court on the 11th day of April, A. D. 1842, be disallowed, and that said last-mentioned report do stand and be confirmed.

"It is further ordered, adjudged, and decreed, that the said John H. Clarke, administrator on the estate of the said Willard W. Wetmore, in his said capacity of administrator, have and recover of the said Henry Mathewson the sum of eight thousand six hundred and eighty-five dollars and sixty-six cents, said sum being the amount found due by said last-mentioned report, together with costs, and that execution issue therefor.

"Let this decree be filed in the clerk's office in this cause.

"JOSEPH STORY,
*Ass. Jus. of the Sup. Ct. of U. States.*
"JOHN PITMAN,
*District Judge U. S. R. I. District.*"

From this decree an appeal brought the case up to the Supreme Court.

Whilst the cause was pending in the Supreme Court, an order was passed, at December term, 1845, directing the masters to review their report. They accordingly made a supplemental and fourth report, addressed directly to the Supreme Court, in which they admit an error in their preceding accounts, from not giving Mathewson a sufficient credit for his commissions and his interest in the copartnership. Correcting this error, they find the amount due by Mathewson to Clarke, including interest up to January 1, 1846, to be $6,241.44. This report was made a part of the record, by agreement of counsel.

In the argument of the case in this court, the exceptions taken to the first report of the masters were not insisted upon any further than they were included in the exceptions to the second; and the exceptions to the third were entirely waived.

None being taken to the fourth, which was made to this court, the argument was confined exclusively to the exceptions to the second report, which have been already stated to have been twenty-four in number.

The cause was argued by *Mr. Albert C. Greene* and *Mr. Webster*, on the part of Mathewson, the appellant, and *Mr. R. W. Greene* and *Mr. Whipple*, for the appellee.

*Mr. Albert C. Greene* gave a history of the case, and of all the voyages which had taken place. He then classified the exceptions so as to include all which related to or depended upon the same general principle of law. And, first, with respect to the right of the complainant to sue. This being a limited copartnership, consisting of the sum of $ 50,000 and the ship, he maintained the three following propositions.

1. That being a limited copartnership, no third person can be admitted without the consent of all the copartners.

2. That no assignment of an interest in a copartnership fund to a third person can give to such third person any right against the rest of the partners, where the right to assign is not provided for in the agreement.

3. That Wetmore, not being an original party, cannot be a party to any suit at law or equity founded on the original agreement.

1st. The relations which exist between partners are either provided for specially by agreement, or result, by operation of law, from a union of funds. They may contract for what they choose, — for example, that one of them shall not enter into a particular branch of business; or they may stipulate for the right to assign, in which case an assignee is in the enjoyment of full rights, flowing from the original agreement. But if the contract is silent upon this point, the law does not permit a third person to be introduced without the assent of the other parties. If we were at law, it is clear that no action would be maintainable, and the same rule must prevail in equity. The relations between partners are of a confidential character, and therefore it is reasonable that no stranger should be brought in. These relations are also mutual. In case of loss, each partner has a right to look to his associates, and ought not to be compelled to rely upon a person whom he may be unwilling to trust. The only evidence of the copartnership of the complainant, Wetmore, is the entry upon the books of Carrington & Co. There was no assignment, no letter informing Mathewson, who was then absent on one of the voyages, nor did he know any thing of it until the service of the subpœna in this case. See Collyer on Partnership, 4, 101; 14 Johns. 318; 6 Madd. 5.

Mathewson *v.* Clarke.

2d. No assignment can be made where it is not provided for in the articles.

There is no evidence here of any assignment to Wetmore which does not show him to have been also admitted as a partner, if it is valid for any purpose. Suppose there was such evidence, what could partners assign except choses in action, which the assignee would be unable to enforce? But the claim here is, that the new partner has the same rights as the old, and has the same right to forbid certain things to be done. If the relation of partner cannot be assigned together with choses in action, then the suit must fail, because the ground of the complainant's claim is that Mathewson had no right, under his agreement, to do certain things which he has done. But this relation cannot be assigned. Mathewson never agreed that any one else should be his master. He had no claim for any thing against Wetmore, and therefore Wetmore can have none against him.

If these two propositions can stand, the third follows of course.

The next general proposition arises from the second and third exceptions, and is this: that Mathewson has a right to the profits upon purchases which he made whilst detained at Lima. If his partners had ratified his acts, the profits would have inured to the common benefit, and Mathewson was willing that this should be done. But we say that his partners should have decided when he asked them; whereas they always avoided saying whether they would sanction his acts or not. The reasoning of the masters is not good. They say, that, as Mathewson's inducements to the purchase were to hasten the settlement of his own cargo, the profits ought to belong to his owners. But they should have adopted or rejected his acts when he informed them what he had done and solicited their sanction.

A general proposition arises under the sixth exception. Martinez had placed money in the hands of Mathewson to be employed for him at Gibraltar. The purchases were made, but Martinez could never more be heard of. To this money we say the other partners have no right whatever. (*Mr. Greene* here examined all the evidence on this subject.)

The next general proposition is, whether and how far Mathewson had a right to trade upon his own private account at the same time that he was trading upon the partnership funds. The masters say that he must not carry his own property in the same ship, although they admit that he has a right to traffic for himself, and send his commodities in another ship to the same market. We apprehend that the true rule is this; that

a partner must not place himself in such a situation that his own private interests will necessarily conflict with those of his partners. Collyer on Part. 100; 6 Madd. 369; 4 Beavan, 534; 1 Sim. & Stu. 124; found also in 1 Cond. Eng. Ch. Cases, 124.

The ninth and eleventh exceptions raise a general question, what were the rights and duties of Mathewson after the loss of the Mercury. We contend that his contract was to take command of that ship, in which he became a part owner. After its loss, he had a right to engage in any thing new, and chartering the Superior was a fresh adventure altogether. If his partners chose to ratify his acts, he was willing to include them; but the evidence in the case shows that they disowned them. The profits must therefore belong to Mathewson alone.

*Mr. R. W. Greene*, for defendant in error, took up the exceptions in numerical order, and examined each one in comparison with the evidence. The general scope of his argument was to show that the voyage was a very hazardous one on the part of the shippers, who had planned the whole series until the termination; that Mathewson had no right to receive presents from his consignees; that it is always suspicious when vendors make presents; that Mathewson was especially debarred from all privileges by the agreement; that he had full power to obtain payment for the arms in any mode, and if the purchase of the Nancy was necessary to accomplish this, it was within his instructions; that he himself thought so, because, when about to do it, he wrote to his partners hoping not to be censured; that his receipts for his own cargo were in fact in this new purchase; that it was a direct breach of duty to receive the money of Spaniards, in the disturbed condition of the country, and might have led to the forfeiture of the property under his control; that he risked the whole cargo for his own private advantage; that he concealed all these matters until the exceptions to his first answer compelled him to disclose them in the second; that he had no right to carry goods on his private account to the same market with those of his partners; that their interests must necessarily clash; that he could not fairly have realized the sum of $ 57,000, which the evidence shows that he did; that he only charged himself with half freight; that the accounts show that he settled with his consignees as if the whole goods belonged to him, and therefore could easily claim, as his own, whatever part he chose; that his average when the steamboat was destroyed was wrong; that the evidence showed that no such man as Martinez had ever existed; that with respect to the profits by the voyage in the Superior, the original voyage, as planned,

was not ended; that Mathewson had no right to trade and speculate upon the money of his partners, but if the voyage was over, he ought to have sent it home; that in fact the partnership was not concluded, but the ship Mercury was only one instrument to carry it on; that Mathewson's letters show this; that in the voyage of the Superior he made 100 per cent. for himself, and only 40 per cent. for his partners.

With respect to the right to sue, *Mr. Greene* drew a distinction between the two voyages. As to the first voyage, the assignee had a right to sue in his own name. 2 Story, Eq. Jur., p. 391, § 1055.

The owner had a right to assign, and the present assignment is sufficient. 2 Story, Eq. Jur., p. 381, 382, § 1047.

As to the right to sue on the new voyage.

It has been said, on the other side, that no new member can be introduced into a firm without the consent of all. But in this case one of the members of the partnership was itself a firm, viz. Carrington & Co., with which the contract was made. The admission of Wetmore did not change the name of the firm. Besides, the contract gave to Mathewson the exclusive control over the business. There was therefore no necessity for consultation. The partners at home had nothing to do but to receive the proceeds. The reason of the rule does not apply. But if we claim as assignee, we have a right to an account. All property is transferable in equity, and the bill was amended so as to include the rights of an assignee.

*Mr. Whipple,* on the same side.

With respect to the right to sue, we do not say that the complainant was a partner in the voyage of the Mercury in any other mode than as he was a member of the firm of Carrington & Co. It has been said, that a partner cannot introduce a stranger into the firm without the consent of the rest. We admit it. But the contract here was between Butler, Carrington & Co., and Mathewson. There was no contract between Mathewson and Carrington himself, or Samuel Wetmore individually. It was with the firm. Carrington's order alone would not have been binding, and in case of his death, the business would be wound up by his surviving partner. The property involved was not liable for Carrington's debts until all the partnership claims upon it were satisfied. If Carrington had drawn an order for money upon Mathewson, he ought not to have paid it, because he knew that all their share of the property belonged to Carrington & Co., and not to Carrington personally. A change in the component members of the firm could make no difference in the rights of Mathewson. The

power to control him was just the same after as before it. In case of loss, the firm of Carrington & Co. would have to contribute, and a portion of this must fall upon the new member. He ought, therefore, to share in the profits. The only question is, whether an assignee can sue a partner. But in equity a bill for a specific performance would lie. All that would be necessary in such a case would be to bring in all the parties who had an interest in the subject.

*Mr. Whipple* then took up and enlarged upon the following propositions.

1. The answer of Mathewson was overthrown and discredited by counterbalancing testimony.

2. There was no difference in principle between Mathewson's right to trade in the Mercury and in the Superior.

3. He had no right to trade upon his own account in either, because it was expressly prohibited by the contract, and because it was at war with the duties which he had undertaken to perform.

These propositions *Mr. Whipple* illustrated at great length.

*Mr. Webster*, in reply and conclusion, gave a particular narrative of the course of the suit, and the transactions between the parties. The first proposition raised by the exceptions is, that the complainant has no right to maintain this suit. We say that he had no interest whatever except as a partner, and that he cannot become so without our consent. It is necessary here to make a distinction between the first and second voyage. Mathewson was not a partner during the first voyage of the Mercury, and after that was over, became a partner to the amount of one tenth. It may be said, that, if Mathewson was not then a partner, our objection to the complainant's right to sue for the first voyage does not apply. But the answer to this is twofold : —

1. Because this bill counts on a special agreement, to which Wetmore, the complainant, was no party. His claim as assignee does not aid him in this.

2. Wetmore never had a particle of interest in the first voyage of the Mercury. This terminated at Gibraltar, in November, 1822 and in December following a new voyage was commenced. But it does not appear from the record that the Mercury and her cargo constituted any part of the $118,987 which was credited to the old concern when a change of the books took place, in 1821. On the contrary, the following extract from the record shows that the Mercury was not brought into the new partnership until the 7th of February, 1824.

*E. Carrington & Co., — old concern,*  Cr.

| | | | | | |
|---|---|---|---|---|---|
| 1824, 7th Feb. | By ship Wm. Baker, as cash, | July, | 1821 | . . | $7,000 |
| | " Nancy, " | June, | 1821 | . . | 3,500 |
| | " Trumbull, " . | Jan'y, | 1823 | . . | 3,500 |
| | " John Brown, " | July, | 1822 | . . | 3,612 50 |
| | " Fame, " | May, | 1823 | . . | 1,500 |
| | " Integrity, " | June, | 1821 | . . | 7,500 |
| | " Mercury, at Gibr., | Dec'r, | 1822 | . . | 5,000 |
| | " Lion, | | 1821 | . . | 14,500 |
| | " General Hamilton, | | 1822 | . . | 2,300 |
| | " George, | | 1821 | . . | 10,000 |
| | " Panther, | | 1822 | . . | 22,000 |
| | | | | | $80,412 50 |
| | By adventure ship Mercury, voyage from Gibr. to Chili, $50,619.18, — for one half . . . | | | | $25,309 59 |

Consequently Wetmore never had any interest in the first voyage. The transfer at the bottom of the account is for one half of the outfit, but does not include any profits at all. He has no right to call upon Mathewson for any explanation of his proceedings.

With respect to the subsequent voyages, the right of the complainant to sue is sustained upon two grounds : —

1. That Carrington & Co. had admitted him as a new partner in their firm ; and,

2. That the complainant was an assignee.

1st. The authorities already cited, Tidd, Collyer, Johnson, and Maddock, are clear, that no new partner can be admitted without the consent of all.

2d. It is said that he was an assignee. But he says himself in the bill that he was a partner. The amendment to the bill, putting his claim upon the ground of being an assignee, does not vary the facts in the case. He was just as much an assignee without putting that in. But his claim to be assignee is only an evasion of a well-settled rule of law. Every new partner can claim to be assignee. In this case he would be a very strange one. He had as much right to control the others' shares as they had to control his. He could draw bills of exchange, settle accounts, &c. I had supposed that an assignment of a chose in action was recognized upon the principle that the assignor had nothing more to do with it. But not so here. Carrington & Co. had as much power over the property as they had before. There was no transfer of any distinct and specific interest. If Carrington & Co. had failed, what would have become of the thing assigned ? It is said that the change was of no consequence to Mathewson. But the answer is, that the rule is general. We are not bound to show any reasons. If we were bound to do so, they might be given. Who knows whether or not Wetmore was an enemy of Mathewson ? Some

12 *

unfriendly things were done afterwards.; for example, they wrote to Alsop to take the business out of Mathewson's hands. How can we know that Willard Wetmore did not do this? It is said, also, that he was not a new partner, because he was only admitted to be a partner in the house of Carrington & Co., which house _eo nomine_ was a member of the copartnership, and that therefore the copartnership remained unaltered. But this makes a commercial firm a corporation. If a contract be made with a firm composed of three persons, and then a fourth be admitted, can all four sue on the contract? Certainly not. The names of the partners must all be set forth in the declaration. They cannot sue in their commercial name. It is only a corporation that can do this. If the complainant had no interest in the first voyage, it disposes of the 2d, 3d, 6th, and 12th exceptions.

The 7th, 9th, and 11th relate to the right of Mathewson to trade upon his own private account. The objection to his doing so is maintained under the 7th article of the agreement, which says that he is to have no privileges. One privilege of a captain is to carry his goods without being charged with freight. This article had nothing to do with the subject. Mathewson carried nothing out, and could only trade on his commissions, What he acquired in this way he could certainly bring home by paying freight. There are some facts in the case which are important.

1. He had only a limited capital to trade upon for his owners, not enough to fill the ship.

2. It was always contemplated that she should earn freight by carrying other goods.

3. The freight thus earned was for the benefit of her owners.

4. The ship was never full.

5. There is no allegation that Mathewson did not load the ship properly.

How Mathewson made his money is entirely immaterial. There is no pretence that he took it from his owners. He has accounted for the whole $50,000. There was no loss or damage of any kind by him. He squandered nothing. On the contrary, his owners made a very large sum of money through his care and skill. But the opposite counsel say that he could not carry his own goods in his own ship. Why not? If he paid freight to any one else, the owners would lose that much. They might then justly have complained. The sound rule of law is, that the master of a vessel must not place himself in a situation where his interest necessarily clashes with that of his owners. Such was not the case here. It is also said, that he should have attended to nothing else than the concerns of his

owners. But he was detained at Lima for ten months without a possibility of expediting the business of his ship. Was he to sit down and think for his owners all this time ?

We regard Mathewson's latter voyages as being out of the contract altogether. The parties probably never contemplated using any other ship than the Mercury. When he chartered three fourths of the Superior, he told his owners of it. They acknowledged the receipt of his letters in which he said that it was upon partnership account, and yet they held their peace upon the subject of sanctioning it. This they had no right to do. The rule is, that where an agent acts clearly beyond the scope of his authority, mere silence on the part of his principal does not ratify the act. He must prove a positive assent. Suppose all this property had been lost. The owners did not ratify the proceeding until all danger was over, and the adventure had been found profitable. But it was then too late. If this chartering was beyond the contract, and the owners claim the profits because Mathewson said he did it for the partnership, they must take the whole of his admissions together.

Mr. Justice McLEAN delivered the opinion of the court.

This is an appeal from the Circuit Court of Rhode Island.

Wetmore, the complainant, states in his bill, that on the 12th of October, 1820, Cyrus Butler, Edward Carrington, and Samuel Wetmore, merchants, doing business under the name of Edward Carrington & Co., of one part, and Henry Mathewson, of the other, all of Rhode Island, entered into an agreement in relation to a certain commercial adventure ; that, in pursuance of the agreement, the ship Mercury was procured, and in December, 1820, Mathewson, as master and supercargo, received her at the Texel, in Europe, with instructions under the contract ; and having purchased the cargo, as directed, he sailed the 30th of March, 1821, to Valparaiso, in Chili, and to other ports and places in Chili and Peru, as required in the agreement ; sold the cargo, and with the proceeds sailed to Gibraltar, at which place he arrived in November, 1822, and there sold the cargo, having completed his first voyage.

The complainant further states, that at Gibraltar, in November, 1822, Mathewson commenced a new voyage or adventure in said ship, and, according to the terms of said agreement, became and was an owner in the ship and cargo of one tenth part thereof. And Butler, Carrington & Co., in pursuance of the agreement, furnished the ship with a cargo of the value of fifty thousand dollars ; and Mathewson sailed on the new voyage from Gibraltar, as master and supercargo, on the 28th of December, 1822. He proceeded to the ports of Rio Janeiro, Val-

paraiso, and other places, backwards and forwards, for trade, freight, and the employment of the ship, until the 10th of June, 1825, when, at the port of Guayaquil, in South America, the ship Mercury was condemned as unseaworthy, and ordered to be sold.

The complainant further states, that, about the 1st of June, 1821, he entered into copartnership with Carrington & Co., and thereupon became and was interested in the ship Mercury and cargo, and in all the concerns of said adventure, according to the terms of said agreement, at and from Gibraltar, as aforesaid, in the proportion of one fourth of nine twentieth parts thereof, and then and there became a partner therein with Mathewson and the other defendants, and so continued to be until the said adventure ended, and until the dissolution of the partnership. In this part the bill was so amended as to enable the complainant to claim as an assignee, &c.

Mathewson is further represented, in December, 1825, as having chartered at the port of Chorillas, or some other place in South America, three fourth parts of the ship Superior, Captain Andrews, on account and for the concern of the ship Mercury, and shipped on board of her a part or the whole of the proceeds of the sales of the ship Mercury and cargo, &c., on the terms and conditions of the agreement, and proceeded therewith to the port of Payta, and to other places backwards and forwards, until the 8th of November, 1826, at the port of Lima, where the charter-party expired, the voyages were ended, and the partnership dissolved.

And the complainant alleges that Mathewson had not rendered a full and fair account of his transactions and of the profits; and the bill prays that he and the other defendants may come to a full and fair account, &c.

None of the defendants, except Mathewson, answered the bill. The accounts were referred to masters at different times, and various reports were made. And the case comes before this court on exceptions to the masters' reports.

Instead of taking up the exceptions, the general principles on which they are founded will be considered.

It is first objected, that the complainant cannot sustain this suit, as he was not a member of the copartnership, and could not be without the consent of Mathewson. The general principle is admitted, that the individuals who compose the partnership cannot be changed without the consent of the whole. And it does appear that Mathewson had no knowledge that the complainant was a partner, or had any interest, in the concern, until some time after his return to the United States. The complainant, therefore, could not be considered or treated as a

partner in prosecuting a partnership claim, or in any other procedure involving the rights of the original partnership.

But the complainant does not represent himself to be a partner in any other light than to show the extent of his interest. He seeks to enforce no right of the firm; but, alleging that the partnership was long since dissolved, he asks that the share of the profits to which he may be entitled shall be decreed to him. And in the amended bill he represents himself to be the assignee of a certain interest in the capital, and consequently entitled to a proportionate share of the profits.

If the firm were still in operation, the complainant, not being a member of it, could have no right or power to dissolve the partnership or to maintain this suit. His remedy would be against Carrington & Co., with whom he made the contract. But the partnership, or whatever it may be styled, having been dissolved, the complainant must be considered as having a certain interest in the fund to be distributed. On this ground he may maintain the suit, although Mathewson may never have had notice of his interest until the bill was filed. The allegation in the bill is, that the defendant has in his hands funds which belong to the complainant. And as it is stated and proved that the business was transacted by Mathewson, without the particular knowledge of the other parties in interest, he may be called on in the form of this bill to account for and pay over to the complainant any moneys in his hands which belong to him. The object seems to be merely to ascertain the distributive share to which the complainant may be entitled, as the answers of the defendants, except Mathewson, have not been required.

The next inquiry is, At what time did the interest of the complainant in the ship Mercury and her cargo accrue?

It is claimed for the complainant, that from the 1st of June, 1821, when his alleged contract of partnership was entered into, his interest in the ship and cargo attached. If this be so, he will be entitled to participate in the profits of the first voyage of the Mercury.

There is no written evidence of the contract between the complainant and Carrington & Co., and we must ascertain the commencement of the contract from the statements in the bill, the books of the company, and other evidence in the case.

The complainant states that Butler and Carrington & Co. furnished the " ship with specie and a cargo for the new adventure, according to the terms of said agreements, of the value of fifty thousand dollars; and the said Mathewson sailed from said port of Gibraltar on said new voyage or adventure in said ship, as master and supercargo, with said

specie and cargo on board, on or about the 28th of December, 1822."

And in the succeeding paragraph the complainant alleges, that about the 1st of June, 1821, he entered into copartnership with the said Edward Carrington & Co., and thereupon became and was interested in the said ship Mercury and cargo, and in all the concerns of said adventure, according to the terms of said agreement, at and from Gibraltar as aforesaid.

This language would seem to be too explicit to be misunderstood. The new voyage or adventure is spoken of from Gibraltar; and the complainant alleges, that, by virtue of his contract, he became interested in the said ship Mercury and cargo in all the concerns of said "adventure," "at and from Gibraltar." And this view is confirmed by a reference to the books of the company, in which the old concern is credited, — " By adventure ship Mercury, voyage from Gibraltar to Chili," $50,619.18; for one half, $25,309.59.

The partnership of the complainant with Carrington & Co. seems to have embraced some ten or eleven vessels; in some, if not in all of which, except the Mercury, the interest of the complainant may have attached at the time of the contract. But, however this may be, we are satisfied that he had no interest in the Mercury, by his own showing, until the new voyage commenced from Gibraltar, in December, 1822.

It seems that Mathewson, as master and supercargo, having funds, traded on his own account, in all the voyages he made; by which means he accumulated as profits a large sum. That trade, it is insisted, was incompatible with his duties as a partner, and was prohibited by his contract.

In the first voyage, which was ended at Gibraltar in November, 1822, Mathewson was to receive " fifty dollars per month as wages as navigator and master of the ship, and also the sum of seven hundred dollars as commission," &c. And he was " to have no privilege in the first voyage."

In the new or second voyage, Mathewson was to have " fifty dollars per month as wages as commander and navigator of said ship, to commence with the new voyage, and as supercargo a commission of five per cent. on the net amount of all property safely returned to the United States, Canton, or Europe, proceeding from the original stock of fifty thousand dollars, together with one tenth of all the profits and earnings made in the voyage or voyages, freights or otherwise." And it was " agreed that the wages and commissions specified and agreed for," as above, " are to be in full of all services and privileges to Captain Mathewson, as master and supercargo, during the voyage or voyages specified."

Usage has given to the masters of vessels and others certain privileges of transportation and traffic, which are denied to Mathewson by the terms of the contract. He agreed that the wages and commissions should be in "full of all services and privileges." The privileges here referred to cannot be limited to the mere right of the master to transport on board of his vessel articles of a certain weight or bulk without charge, but to all privileges whatsoever which by usage he might claim. The compensation to be paid was in full for the relinquishment of any usage or privilege of traffic, as well as for services to be rendered. This seems to be the import of the agreement. And when we consider the nature of the trust vested in Mathewson, the propriety of such an arrangement is clear.

He was to be the acting partner in the voyages contemplated, having under his control the large capital invested, with power to trade from port to port, and to buy and sell as he should deem best for the interest of the company. He was entitled, for his part of the capital, to a ratable proportion of the profits. Now, is it reasonable to be supposed that the merchants with whom he was associated would allow him to be engaged on his own account in a commercial enterprise in which he might secure to himself the profits of the trade, and throw upon his partners the loss? This is not like the case where the master, having merely the command of the ship, exercises his privilege. The supercargo is the agent of the owners, and disposes of the cargo and makes purchases under their general instructions on his own responsibility.

But Mathewson was master and supercargo, exercising full powers over the vessel and cargo. He purchased and sold where he could do so to the best advantage; and for his entire services in this agency, and for the management of the ship, he was paid. Now, can an agent, thus acting for his principals, engage in a traffic on his own account? He buys for himself and his principals at the same market, and sells at the same. On the one side, he is interested in a small portion of the profits, and in a commission of five per cent. On the other, he realizes the entire profits, deducting therefrom the common charge of freight. In the purchases and in the sales, under such circumstances, the agent would be influenced, as may be reasonably supposed, by his own interests. From the accounts rendered, it appears that a much larger profit was realized by Mathewson on his private sales than on the sales for the company. Whether this resulted from the more judicious purchases or sales in the private enterprise, it shows that the traffic was inconsistent with the general agency. It was a rival interest, hostile to the interest of the company, exercised by their

agent, and without their approbation or knowledge.   This the law will not sanction.   It requires not only a *bonâ fide* action by an agent, but that he shall be free from those selfish motives which conflict with the interests of his principals.

After the condemnation and sale of the ship Mercury, three fourths of the Superior were chartered by Mathewson, and it is insisted, that any restrictions on his private trading, in the contract, on board of the Mercury, cannot be applied to similar transactions on the Superior, that the contract of partnership terminated on the sale of the Mercury, and that if the new adventure on board of the Superior be sanctioned, it must be taken subject to the conditions imposed by Mathewson, one of which was his private trading.

It does not appear from the contract or the correspondence of the parties, that any other ship than the Mercury was named or referred to, in which the commercial enterprise contemplated was to be carried on.   And it may be said that the condemnation of that vessel ended the adventure.   But Mathewson, without the authority or knowledge of his company, chartered another vessel, and used their capital in the enterprises in which he was subsequently engaged.   Of necessity they sanctioned this procedure, as a disavowal of it would have limited their claim, at least in effect, to the personal responsibility of their agent.

In his letter dated at Guayaquil, 16th August, 1825, to Carrington & Co., Mathewson says : — " If I can get the ship " Superior " at a fair charter, I shall return back to Canton by the way of Manilla, with the intention of returning to this coast again," &c.   And again, — " Should I take the ship Superior, I expect to have the same interest in the voyage as I had in the Mercury, and wish you to keep my property constantly insured."   A similar expectation is expressed in a letter dated Lima, 10th November, 1825.

And again, in a letter dated at Lima, 16th November, 1825, after giving an account of the loss occasioned by the explosion on board the steamboat Tilica, he says : — " I have chartered three fourths of the ship Superior, Captain Andrews, for a voyage to Canton, via Manilla, and back to this coast.   Copy of the charter-party inclosed, which I hope will be satisfactory to you.   I expect to have the same interest in the charter of this ship as I had on the former voyage in ship Mercury, and wish you to keep my interest insured."

Butler and Carrington & Co. wrote a letter to Mathewson, dated Providence, July 10th, 1826, in answer to various letters received from him, in which they speak discouragingly of the adventure in the Superior, decline sending another ship, as

requested by him, and advise him to return home in the Superior, making the best disposition he can of their property, &c. At the date of this letter, the Superior was probably on her return voyage, as she arrived at Valparaiso on the 5th of October following. There was no dissent from the terms proposed by Mathewson in his three letters, above referred to, and of course the law implies an acquiescence. Indeed, from the directions given by the company in regard to their property, a sanction, though a reluctant one, and somewhat indirect, was given to the proceedings of their agent, as connected with the Superior. The refusal to advance money to Mr. Mathewson, under the circumstances, does not seem to have any direct bearing on this point.

It is claimed for Mathewson, that the company purposely avoided sanctioning his acts in regard to the Superior, until the result of the adventure should be known, when they could act as their interests might dictate.

The use of the capital of the company, which subjected it to the hazards of trade, under the circumstances, would, on equitable principles, entitle the company to the profits of the enterprise. But looking at the declarations of Mathewson about the time the ship Superior was chartered, and the nature of the enterprise undertaken, we feel authorized to say, that the relation of the parties to each other was not changed by this adventure. The rule applied to the Mercury, in regard to the rights of the complainant and the responsibilities of the defendant, must be applied to the Superior.

After the appeal was taken to this court, errors being discovered in the report of the masters, by consent, their report was returned to them for correction. And in their report to this court, dated the 1st of January, 1846, they say that they erred in their former report, in not making to Mathewson allowance for his commissions, and for his one tenth of the profits and earnings.

This last report finds a balance due to the complainant of two thousand nine hundred fifty-eight dollars and three cents; to which they add interest from the 1st of July, 1827, to January 2d, 1846, making three thousand two hundred eighty-three dollars and forty-one cents; which sum being added to the above balance makes the sum of six thousand two hundred forty-one dollars and forty-one cents.

From this sum must be deducted any amount charged for or against the defendant, by the masters in their reports, as the profits of trade or otherwise on his private account during the first voyage of the Mercury. And under the views expressed in this opinion, the complainant being interested in the Mer-

cury and her cargo in her voyage from Gibraltar, in December, 1822, the exceptions to any items charged against the defendant and allowed to the complainant, arising out of any private trading by the defendant on board the Mercury, and afterwards on board of the Superior, are overruled. The exceptions which apply to allowances made to the complainant against the defendant, growing out of the first voyage of the Mercury, ending at Gibraltar, are sustained.

The decree of the Circuit Court is reversed, and the cause is remanded to that court, with instructions to enter a decree in pursuance of this opinion.