12869

PIEDMONT PRESS ASS'N v. RECORD PUB. CO. *ET AL.*

(152 S. E., 721)

44

*Messrs. C. T. Graydon,* and *H. K. Osborne,* for plaintiff,

*Messrs. Nicholls, Wyche & Byrnes, Benj. F. Pierce,* and *D. W. Robinson,* for defendants.

March 26, 1930.

The opinion of the Court was delivered by MR. JUSTICE COTHRAN.

This is an action solely for injunction in the original jurisdiction of this Court commenced February 17, 1930.

At the time of the commencement of the action, the plaintiff obtained from three of the justices of this Court an order requiring the defendants to show cause before this Court at 10 a. m., or as soon thereafter as counsel can be heard, on Monday, the 10th day of March, 1930, why the prayer

of the plaintiff should not be granted and why the said defendants, their agents and servants and all persons acting under or on their behalf, should not, pending this action, be restrained and enjoined from trespassing or entering upon the premises occupied by the plaintiff at the Record publishing building in Columbia, S. C.; from interfering or intermeddling with said plant and the publication of the Columbia Record and Sunday Record; from intermeddling with any other properties covered by the lease referred to in the complaint; from interfering with any of the officers, agents, or employees thereof; from intermeddling or interfering with any other business of the plaintiff; and from attempting to interfere with or dissuade any of the debtors of the said company from promptly paying to the said company any amounts due by them to the said company incident to the operation of the business of the plaintiff. The order also contained a temporary restraining provision, in the meantime.

At the appointed time the matter came on for hearing.

The defendants submitted a motion to dismiss the complaint upon various grounds stated, and at the same time, reserving the right without prejudice to insist thereupon, submitted their joint answer to the complaint, supported by sundry affidavits and exhibits.

The *apparent* controversy, as will appear, is between the plaintiff, Piedmont Press Association, claimed to be a corporation of South Carolina and a lessee of the defendant Record Publishing Company, and the last-named company, likewise a South Carolina corporation, in reference to the possession of the property of the Record Publishing Company and the operation of the newspaper business heretofore conducted by it. The plaintiff claims to be in possession under a valid lease, and that the defendants are interfering and threatening to further interfere with its possession and operation. The defendants deny the validity of the alleged lease and insist that they are entitled to such possession and operation under the circumstances which will be hereinafter detailed.

The *real* controversy, as we shall endeavor to show, is between William LaVarre and Harold Hall, individuals once engaged, under friendly relations, in a joint enterprise of acquiring the capital stock of the Record Publishing Company for the purpose of conducting the operation of publishing that newspaper, but now embroiled in bitter and apparently irreconcilable conflict.

The facts, as we find them from the mass of pleadings, affidavits, exhibits, and records, are those (adopting as we feel obligated to do, and independently are so inclined, the findings of fact of the Georgia Federal Court, as will be explained later) :

In the latter part of the year 1928, William LaVarre and Harold Hall made an arrangement with the International Paper Company, by which that company agreed to and did advance to them approximately $900,000, for the purchase of the capital stock of three newspaper corporations, the Augusta Chronicle of Augusta, Ga., the Spartanburg Herald-Journal Company of Spartanburg, S. C., and the Record Publishing Company of Columbia, S. C., and to liquidate the outstanding bonded indebtedness of said corporations respectively.

As per agreement, LaVarre and Hall executed notes to said corporation representing the advance and agreed to pledge the acquired stock as collateral thereto.

It seems that the advance was made before the stock was acquired; it does not appear that it has ever been actually hypothecated as agreed.

The proceeds of the loan, in large measure, were used in the purchase of the stock which appears to have been issued in the name of LaVarre alone. The defendants allege that of the said proceeds LaVarre retained and deposited to his own credit in certain banks $122,000 which should have been applied to the outstanding bonded debts of the several corporations, and later used a considerable amount of said funds.

After the consummation of the purchase of the stock of the Record Publishing Company, the former directors and officers of that corporation resigned, on March 15, 1929, at a meeting of the board of directors composed of Wright, Tobias, Taylor, and Marshall. (Why this meeting was that of the old *board of directors,* and not of the then existing *stockholders,* does not appear.) At that meeting of the board of directors, LaVarre, Hall, and McMaster were elected directors; and that at a continuation of the meeting the following officers were elected: LaVarre, president, Hall, vice-president, LaVarre, treasurer, and McMaster, secretary; and additional officers, Marshall, assistant treasurer, Taylor, assistant secretary.

The corporation, the Record Publishing Company, continued in the possession of the newspaper property and the conduct of its operations.

On April 4, 1929, in accordance with the Act of Congress a statement of the ownership, etc., of the Record was transmitted to the United States Post Office Department and was published in the Record; it declared, under the affidavit of both LaVarre and Hall, that at that time the paper was being published by the Record Publishing Company; the names of the editor, managing editor, and business manager; "that the owner is the Record Publishing Company *all of the capital stock of which is owned by William LaVarre and Harold Hall";* and the names of bondholders, mortgagees, and other security holders.

On May 23, 1929, LaVarre with certain other corporators filed a petition for a charter to be issued in the name of the Piedmont Press Association by the secretary of state, and the same was issued upon that date; with a somewhat euphemistic introduction the general purposes of the corporation were declared to be "to establish a system and organization for the gathering and distribution of news, information, statistics and literary features relating to matters of national and local interest; to create, sell and place advertising; to own and operate or invest in newspapers, mag-

azines and other periodicals; to do a general printing and publishing business; and to do any and all other things necessary and incident to and in furtherance of the purposes aforesaid." The capital stock was placed at 1,000 shares, of no par value. The directors named were Hearon, McMaster, Hamilton, and LaVarre, "although the last, not least"; the officers, LaVarre, president, Hearon, vice-president, McMaster, vice-president and secretary, Hamilton, treasurer.

The entire proposed stock was subscribed for by LaVarre, and "qualifying certificates" were issued to Hearon, McMaster, and Hamilton, 2 shares each, and 994 shares to LaVarre.

The minute book of the Record Publishing Company shows a record of a stockholders' meeting of the corporation as of June 22, 1929. (The contention of the defendants is that the minutes of that meeting were not entered in the minute book for many months thereafter.) The minutes declare that the meeting was held "by unanimous consent and waiver of the stockholders of the" corporation, although it appears that it was without notice to or knowledge of Hall, a joint owner with LaVarre of the entire capital stock with a minor exception to qualify certain directors.

The directors then in office by election at the meeting of March 15, 1929, were LaVarre, Hall, and McMaster. Although Hall was vice-president and director under the election of March, and had no notice of the stockholders' meeting of June, and of course was not present as the minutes show, it appears that LaVarre, who was chairman of the meeting, offered a resolution, which was adopted, calling for the resignation of all of the officers and directors. Accordingly LaVarre and McMaster tendered their resignations (as president and secretary, respectively, and as directors); Hall, vice-president and director, not being present, of course did not resign either position. Notwithstanding the fact that there was no vacancy in either position, the meet-

ing proceeded with the election of LaVarre, McMaster, and Taylor as directors.

After the election of directors a meeting of the board was held immediately at which LaVarre was elected president and treasurer, McMaster, vice-president, Taylor, secretary, and Marshall, assistant secretary, and the board undertook to authorize and approve a contract of lease of the property of the Record Publishing Company to the Piedmont Press Association, the entire stock in which was claimed by La-Varre with the exception noted.

Later on the same day, a stockholders' meeting, at which LaVarre and McMaster alone were present, was held, which undertook to ratify the action of the board and to authorize the execution of the said lease by McMaster as vice-president and Taylor as secretary.

The record does not contain a statement to that effect, but we assume that the Piedmont Press Association held a stockholders' meeting on the same day, at which the stock of 994 shares out of the 1,000 were represented by LaVarre and at which the proposed lease of the property of the Record Publishing Company was authorized.

At any rate on the same day, June 22, 1929, the lease was executed by the named officers of the Record Publishing Company, and apparently was accepted by the press association.

Under the terms of the lease the Record Publishing Company leased all of the property which it had in the City of Columbia, which included its printing establishment and plant located in the Record building, at the corner of Lady and Sumter streets in the City of Columbia, together with all printing and office equipment and supplies and every other species of property which it owned. The lease contained the following clause: "Has granted, leased and demised and by these presents does grant, lease and demise to the said Association all of the property, rights and franchises now owned or hereafter to be acquired by the said company, and all the right, title and interest which the said

company now has or may hereafter acquire therein, including real estate, equipment, type, furniture, fixtures, automobile, newspaper files, cash, notes, accounts receivable, contracts, paper, engravings, material and supplies, stationery, leases and all other property of whatsoever nature and kind and wheresoever situate, and also all benefits arising from any and all contracts or agreements which said company has made or hereafter may make or acquire or may hereafter be entitled to receive by law or in equity." The term of the lease expires on June 1, 1979.

The press association claims to have immediately gone into possession of the property under the lease, although the "masthead" of the paper of the dates of October 2, 1929, November 26, 1929, and December 2, 1929, declares that the paper was being published by the Record Publishing Company, and the statement of the ownership, etc., of the paper (transmitted to Post Office Department under the Act of Congress), of date October 8, 1929, declares that the publisher was William LaVarre, and that the owner was "The Record Publishing Company, all the capital of which is issued to William LaVarre (950) shares and Fitzhugh McMaster (50) shares."

The same declaration appears in the statement transmitted on December 3, 1929, except that it there appears, in addition to the statement that the paper was being published by LaVarre, that it was being published "at the offices of the Record Publishing Company, Columbia, S. C.," which corporation was "a member of the Piedmont Press Association," a statement inconsistent with the claim that the paper was being published by the press association, and manifestly untrue if the present claim of the press association be true.

There appears on the record book of the Record Publishing Company, a minute of the same date as that of the stockholders' meeting of June 22, 1929, signed by LaVarre, to the effect that he was the owner and holder of 950 shares of the capital stock of Record Publishing Company and has agreed "for value, and in view of their individual efforts

and loyalty to their positions, to give to Mr. J. J. Marshall and Mr. Wyatt Taylor, each, five shares of said stock, to be partitioned from the certificates standing in my name"—a fact inconsistent with the finding of the Georgia Court that the stock was jointly owned by LaVarre and Hall, as will be seen.

On June 24, 1929, LaVarre undertook to hold a similar meeting of the stockholders and directors of the Spartanburg Herald-Journal Company for the purpose of changing the officers of said company and the control thereof, and for the purpose of displacing said Hall, and for the purpose of executing a lease in the name of said company for the Spartanburg paper for the term of fifty years, similar to that which he undertook to execute for the Columbia Record. These acts and the attempted lease were made without notice to, or knowledge of, Hall, who, as adjudged by the Georgia Court, was a joint owner with LaVarre of the stock of the Spartanburg corporation, as will appear later.

On June 25, 1929, LaVarre undertook precisely the same program in reference to the Augusta Chronicle Company, which was halted by an injunction in the State Court of Georgia, as will be explained.

It is apparent from these proceedings that LaVarre was proceeding with a well-defined purpose of barring Hall from all participation in the affairs of all three of the corporations, and, as the sequel will show, of denying to him any interest in the stock which had been purchased upon their joint account.

Upon learning of the aforesaid proceedings and purpose of LaVarre, Hall commenced an action in the Superior Court of Richmond County, State of Georgia, against LaVarre and caused an injunction to be issued against him, in which action Hall claimed equal ownership and control in the three corporations above referred to; upon his verified petition LaVarre was enjoined from changing the status of the joint enterprise; LaVarre appeared in said action and filed a petition claiming to be a resident of the State of South Caro-

lina for the removal of the cause to the United States District Court having jurisdiction in that county; he appeared in Court and filed an answer claiming to be the owner of the entire stock of said corporations, and that Hall was merely an employee of his; a full hearing and trial was had by said District Court during the months of August and September, 1929, the trial lasting approximately thirty days; upon said hearing the parties agreed in open Court that the hearing should be treated as a plenary and final hearing, and that a final decree should be entered upon all of the issues involved. A final decree was thereafter rendered by the Hon. Bascom S. Deaver, District Judge presiding, bearing date September 30, 1929; in the decree his Honor found and adjudged among other things: "That Harold Hall and William La-Varre are jointly and equally interested in all of the capital stock, both common and preferred" of the said several newspaper companies, excepting 5 shares of preferred stock of the Chronicle Company which had not been purchased.

The Court further found and adjudged that each of said parties, Hall and LaVarre, had an equal right to own, vote, control, and enjoy the stock, and that they were jointly and equally interested in all of the assets of the joint estate. The Court dissolved the joint ownership, provided for an accounting between the parties to determine the liabilities of each, and specifically enjoined LaVarre and Hall "from in anywise interfering with the assets of the joint estate, or with the administration of the same under the orders of this Court or with the Commissioner herein and hereby appointed, by legal action or otherwise, in carrying out the terms of this decree, and that the said Harold Hall and William LaVarre be and they are hereby enjoined from proceeding in any way as individuals or officers of either of said corporations, or as directors or stockholders of said corporations, to change the status of said corporations, and from proceeding in any Court for the administration of the assets of said corporations" until authorized by a vote of

the stock, which the Court provided should be transferred to and held by J. T. Webb, Jr., commissioner.

The decree further appointed J. T. Webb, Jr., as commissioner, and authorized and directed him to take charge of all of the stock and have issued to him certificates for all of the stock of said respective corporations, and to safeguard and protect the same and use the stock as provided in said order and in any subsequent administrative orders that might be passed in the case; and that he take into his custody and control all moneys and other assets of the joint estate, whether in the custody of the Court or elsewhere.

It will be observed that the decree adjudicated the controlling issue in the case in favor of Hall; that he and LaVarre were joint owners of the stock in the several corporations which had been purchased upon their joint account; the adjudication involved the ownership of the stock in all three corporations, the Georgia corporation and the two South Carolina corporations as well; and of course related back to and established the status of the stock at the times that LaVarre made the attempts to reorganize them and confirm the leases to the Piedmont Press Association.

Referring concretely to the Record Publishing Company, the attempt of LaVarre to oust Hall from his positions as vice-president and director, without notice to him and without a vacancy having been created, in the directors' meeting of June was void; and the stockholders' meeting at the same time without notice to Hall and under circumstances showing that he was claiming practically the entire issue of stock as his own was a fraud upon the rights of Hall, and its action in attempting to ratify and approve the lease to the Piedmont Press Association cannot stand.

The right of the plaintiff to maintain the present action depends of course upon its establishment of the validity of the lease, which for the reason stated it has failed to do.

There can be no question but that the Georgia Court had jurisdiction of the person of LaVarre; he appeared in the State Court, petitioned for removal to the Federal Court, answered, appeared at the trial, and contested the claim of Hall. It is equally clear that this Court should respect the adjudication of the issues by the Federal Court.

Judgments and decrees of Courts having jurisdiction of parties and of the subject-matter cannot be collaterally attacked, however erroneous, unless procured through fraud or collusion. *Barnes v. American Fertilizer Co.,* 144 Va., 692, 130 S. E., 902; *Fink v. Fink,* 103 Va., 423, 137 S. E., 703; *Scott v. Newell,* 146 S. C., 385, 144 S. E., 82, 89 (7-10).

The following is an excerpt on this point from the opinion in *Scott v. Newell:*

"A judgment may be attacked collaterally only when its defects and infirmities are apparent by an inspection of it. *Finley v. Robertson,* 17 S. C., 435; *Tederall v. Bouknight,* 25 S. C., 275; *Turner v. Malone,* 24 S. C., 398.

"A direct attack is made by motion on notice in the same case with the same parties. *Crocker v. Allen,* 34 S. C., 452, 13 S. E., 650, 27 Am. St. Rep., 831. In the case of *New York Life Ins. Co. v. Mobley,* 90 S. C., 552, Syl. 2, 73 S. E., 1032, this Court held:

" 'A jurisdictional defect, which does not appear upon an inspection of the record, does not render the judgment void, but only voidable, and any proceeding to have the judgment declared a nullity, other than a motion in a cause, must be regarded as a collateral attack on the judgment.' "

The rule of comity is thus stated in *Ponzi v. Fessenden,* 258 U. S., 260, 261, 42 S. Ct., 309, 310, 66 L. Ed., 607, 22 A. L. R., 879:

"The chief rule which preserves our two systems of Courts from actual conflict of jurisdiction is that the Court which first takes the subject-matter of the litigation into

its control, whether this be person or property, must be permitted to exhaust its remedy, to attain which it assumed control, before the other Court shall attempt to take it for its purpose. The principle is stated by Mr. Justice Matthews in *Covell v. Heyman,* 111 U. S., 176, 28 L. Ed., 390, 4 S. Ct., 355, as follows:

" 'The forbearance which Courts of co-ordinate jurisdiction, administered under a single system, exercise towards each other, whereby conflicts are avoided, by avoiding interference with the process of each other, is a principle of comity, with perhaps no higher sanction than the utility which comes from concord; but between State Courts and those of the United States it is something more. It is a principle of right and of law, and therefore, of necessity. * * * ' "

To the same effect *Kline v. Burke Const. Co.,* 260 U. S., 229, 43 S. Ct., 79, 67 L. Ed., 226, 24 A. L. R., 1077.

Indeed the statute which forbids the issuance of an injunction in a Federal Court to restrain proceedings in a State Court is held not to apply in a case where it is invoked to preserve the jurisdiction first acquired. *Looney v. Eastern Tex. R. Co.,* 247 U. S., 221, 38 S. Ct., 460, 462, 62 L. Ed., 1084; U. S. C. A. title 28, § 379 (Judicial Code, Section 265), par. 9, pp. 204-206, and cases.

In the case of *Looney v. East. Tex. R. Co.,* the Supreme Court of the United States says:

"The use of the writ of injunction, by Federal Courts first acquiring jurisdiction over the parties or the subject-matter of a suit, for the purpose of protecting and preserving that jurisdiction until the object of the suit is accomplished and complete justice done between the parties is familiar and long established practice, *Freeman v. Howe,* 24 How., 450, 16 L. Ed., 749; *Harkrader v. Wadley,* 172 U. S., 148, 163, 164, 43 L. Ed., 399, 404, 405, 19 S. Ct., 119, in a rate case, *Missouri v. Chicago, B. & Q. R. Co.,* 241 U. S., 533, 543, 60 L. Ed., 1148, 1156, 36 S. Ct., 715.

So important is it that unseemly conflict of authority between State and Federal Courts should be avoided by maintaining the jurisdiction of each free from the encroachments of the other, that Section 265 of the Judicial Code, Revised Statutes, Section 720, Act of March 2, 1793, c. 22, 1 Stat. L., 334 (Comp. St. 1916, § 1242 [28 U. S. C. A., § 379]), has repeatedly been held not applicable to such an injunction. *Julian v. Central Trust Co.*, 193 U. S., 93, 113, 48 L. Ed., 629, 639, 24 S. Ct., 399; *Simon v. Southern Ry. Co.*, 236 U. S., 115, 59 L. Ed., 492, 35 S. Ct., 255."

See, also, *Smith v. Apple*, 264 U. S., 279, 280, 44 S. Ct., 311, 68 L. Ed., 678; *Sov. Camp W. O. W. v. O'Neill*, 266 U. S., 298, 45 S. Ct., 49, 69 L. Ed., 293; *Wells, Fargo & Co. v. Taylor*, 254 U. S., 183, 41 S. Ct., 93, 65 L. Ed., 205.

The subject of the respect which one Court should give to the judgments of other Courts, under the "due faith and credit" clause of the Constitution, has received careful attention in the case of *Scheper v. Scheper*, 125 S. C., 99, 118 S. E., 178, 181, where it was said:

"Generally, a judgment which is final and conclusive in the State where rendered is conclusive in all other states in a suit between the same parties or their privies involving an issue determined in the former suit. 15 R. C. L., 928; *Carpenter v. Strange*, 141 U. S., 87, 11 S. Ct., 960, 35 L. Ed., 640; *Roller v. Murray*, 71 W. Va., 161, 76 S. E., 172, L. R. A.; 1915-F, 984, Ann. Cas., 1914-B, 1139. * * *

"But, under the law of comity, as the judicial determination of a competent Court of a sister state, whereby the marital status of the husband was denatured of its efficacy to give rise to or support a legal right in the wife's separate property, we see no reason why that judgment should not be given the same force and effect in this jurisdiction as in the state of its rendition. * * *"

We do not think that the fact that the Piedmont Press Association was not a party to the litigation in the Georgia Federal Court can possibly affect the

conclusion arrived at in the decree of that Court, in reference to the joint ownership of the various stocks. The plaintiff in the Georgia action, Hall, distinctly in his petition tendered the issue of joint ownership of the purchased stock in all three of the corporations; LaVarre, defendant in that action, accepted the issue, claiming the entire ownership of all of the stock in all of the corporations. The Court decided against him, and in its jurisdiction of him personally it unquestionably had the right to decide this issue tendered and accepted, regardless of where the corporations which had issued the contested stock were located.

In *Scheper v. Scheper,* 125 S. C., 99, 118 S. E., 178, 183, this Court said:

"The North Carolina Court, having jurisdiction of the person of the husband and of the matrimonial relation certainly insofar as it involved the subordination of the husband's marital rights in the wife's property to the discharge of his obligation to support, cherish, and protect his wife and child, had power to adjudicate and fix the measure of those rights. While its judgment could have no efficacy to operate directly upon property beyond its jurisdiction nor to establish or divest title to land in another state, the doctrine that 'a Court of Equity, having authority to act upon the person, may indirectly act upon real estate in another state through the instrumentality of his authority over the person,' is well settled. *Bates v. Bodie,* 245 U. S., 520, 38 S. Ct., 182, 62 L. Ed., 444, L. R. A., 1918-C, 355; *Fall v. Eastin,* 215 U. S., 1, 30 S. Ct., 3, 54 L. Ed., 65, 23 L. R. A. (N. S.), 924, 17 Ann. Cas., 853; *Corbett v. Nutt,* 10 Wall., 464, 19 L. Ed., 979; *Carpenter v. Strange,* 141 U. S., 87, 11 S. Ct., 960, 35 L. Ed., 647; *Hart v. Sansom,* 110 U. S., 151, 3 S. Ct., 586, 28 L. Ed., 101. In *Dull v. Blackman,* 169 U. S., 243, 18 S. Ct., 333, 42 L. Ed., 733, the Supreme Court of the United States, while recognizing that litigation in regard to real estate belongs to the Courts of the State where the land is located, said:

" 'Although if all the parties interested in the land were brought personally before a Court of another state, its decree would be conclusive upon them and thus in effect determine the title.' "

"Where the Court has jurisdiction *in personam*, it has power to require the defendant to do, or, to refrain from doing, anything beyond the limits of its territorial jurisdiction, which it might require to be done or omitted within the limits of such territory." *French v. Stewart*, 22 Wall., 250, 22 L. Ed., 854.

"Where the necessary parties are before a Court of Equity, it is immaterial that the *res* of the controversy, whether it be real or personal property, is beyond the territorial jurisdiction. * * * It has the power to compel the defendant to do all things necessary, according to the *lex loci rei sitæ*, which he could do voluntarily, to give full effect to the decree against him. Without regard to the situation of the subject-matter, such Courts consider the equities between the parties and decree *in personam* according to those equities, and enforce obedience to their decrees by process *in personam*." *Phelps v. McDonald*, 99 U. S., 298, 308, 25 L. Ed., 473.

We do not think that the Piedmont Press Association can successfully maintain the position that in the acquisition of the lease from the Record Publishing Company it was a purchaser in good faith, for valuable consideration, without notice. It was clearly chargeable with the notice which its president, LaVarre, had of the questionable methods adopted by him in obtaining the lease to which reference has been made; methods so questionable as to invalidate it.

We are much impressed with the argument of counsel for the defendants that the Piedmont Press Association was a fiction, created for the purpose of ousting Hall from all participation and interest—in other words that LaVarre, who held 994 out of the 1,000 shares, was the Piedmont Press

Association; in the language of the French King Louis, "L'etat, c'est moi." The Special Master in his report filed after the filing of the decree so found, to which the defendant LaVarre filed no exception, and his Honor, Judge Deaver, on February 1, 1930, signed a further decree adjudging, among other things, that the Piedmont Press Association was merely an agency of the joint enterprise of Hall and LaVarre. See *Easton Nat. Bank v. American Brick & Tile Co.*, 70 N. J. Eq., 732, 64 A., 917, 8 L. R. A. (N. S.), 272, 10 Ann. Cas., 84; *Lea v. Iron Belt Mercantile Co.*, 147 Ala., 421, 42 So., 415, 8 L. R. A. (N. S.), 279, 119 Am. St. Rep., 93.

We cannot but think that, when his Honor, Judge Deaver, by his decree, determined the joint ownership of the stock in Hall and LaVarre, dissolved that joint ownership, appointed practically a Receiver of the assets of the joint ownership, directed a transfer of the stock by LaVarre to that Receiver, and authorized him to vote the stock as such Receiver, he contemplated a reorganization of the corporation and a resumption by it of the possession and operation thereof.

In pursuance of the decree the defendant J. T. Webb, Jr., as commissioner, to whom all of the stock of said corporations had been transferred and new certificates issued to him as commissioner, proceeded to elect directors and officers of the Record Publishing Company and to take charge of its assets, plant, and property in the City of Columbia on January 29 and 30, 1930, but was prevented from doing so by LaVarre and his associates and employees, LaVarre continuing in possession and operation, claiming to act as an officer of the Piedmont Press Association.

From this decree LaVarre appealed to the United States Circuit Court of Appeals for the Fifth Circuit; he failed to supersede the decree by providing the bond required by the orders of said Court.

It appears that this appeal is pending in the United States Circuit Court of Appeals; and as the opinion of this Court is based upon the assumed correctness of the adjudication, it seems proper for this Court to retain jurisdiction of the present controversy until the mandate of the Circuit Court of Appeals in the appeal referred to shall have been transmitted to the United States District Court. If the decree of his Honor, Judge Deaver, should be affirmed, it would be in order to dismiss the complaint in the present action; if it should be reversed, it would be necessary for this Court to resume consideration of the case.

In the meantime the temporary injunction in the order of February 17, 1929, by three of the justices of this Court, is hereby vacated.

MR. CHIEF JUSTICE WATTS and MESSRS. JUSTICES BLEASE, STABLER and CARTER concur.