928 F.2d 632
 CONSTRUCTION TECHNIQUES, INCORPORATED; Construction
Techniques, Incorporated, as successor in Interest
to VSL Corporation, Plaintiffs-Appellants,
v.
Donald C. DOMINSKE; Nelly Dominske, Defendants-Appellees.
 No. 90-2373.
 United States Court of Appeals,
Fourth Circuit.
 Argued Jan. 7, 1991.
Decided March 20, 1991.
 
 Frederick William Whatley (argued), James D. Wilson (on brief), Walter, Haverfield, Buescher & Chockley, Cleveland, Ohio, for plaintiffs-appellants.
 Mason Anderson Goldsmith, Love, Thornton, Arnold & Thomason, Greenville, S.C., for defendants-appellees.
 Before ERVIN, Chief Judge, BUTZNER, Senior Circuit Judge, and YOUNG, Senior U.S. District Judge for the District of Maryland, sitting by designation.
 ERVIN, Chief Judge:
 
 
 1
 This appeal presents the situation of an employee, Donald Dominske, who owned a half interest in one of his employer's main suppliers, an interest which the employer, Construction Techniques, Inc. (Contech), claims was undisclosed and therefore constituted a breach of Dominske's fiduciary duty to Contech. The district court, applying South Carolina law, found that Dominske's interest in the supplier was not adverse to Contech's interests. The court further held that Dominske did not breach his fiduciary duty to his employer because he had disclosed his interest in the supplier to Contech.
 
 
 2
 We hold that an employee's interest in his employer's supplier is inherently adverse to the interests of the employer under principles of agency law. Nevertheless, we affirm the district court's finding that Dominske's disclosure to Contech prevented a breach of fiduciary duty on Dominske's part.
 
 I.
 
 3
 Contech, an Ohio corporation wholly owned by Intrusion Prepakt, Inc., sells fabric forming systems which are used for such purposes as lining drainage ditches or protecting embankments. The fabric form is sewn or woven together so that, when filled with concrete slurry, the slurry is forced to take the shape of the form and hardens into that shape. Prior to coming to work for Contech in 1982, Donald Dominske was employed as a sales manager for VSL Corporation (VSL), Contech's only American rival in the fabric forming systems business.
 
 
 4
 In constructing its systems, VSL used polypropylene fabric purchased from foreign sources which made the fabric under the Villiger patent owned by VSL. VSL itself never manufactured the fabric. Contech, on the other hand, sold systems made with a much more expensive nylon fabric. Contech also wished to market polypropylene fabric because it was stronger than nylon, but Contech was unable to persuade Collins & Aikman (C & A), its supplying mill, to manufacture polypropylene fabric. VSL likewise tried unsuccessfully to find a domestic supplier of polypropylene fabric. Eventually, however, TASCO, a small South Carolina company, agreed to produce the fabric for VSL.
 
 
 5
 In 1978 TASCO and VSL negotiated a contract which provided for, inter alia, a license to TASCO of the technology of the Villiger patent, a price term with escalators, and a ten-year original term with a ten-year option in TASCO to extend. Although Dominske was an employee of VSL at the time the contract was negotiated, he had nothing to do with the negotiations.
 
 
 6
 The owners of TASCO decided to part ways in 1980, leaving VSL again without a domestic supplier. Dominske suggested to his boss, Watts, that VSL begin its own manufacturing operation. Watts indicated that VSL had no interest in becoming involved in manufacturing the fabric. Meanwhile, Henry Scharling, one of the co-owners of TASCO, entered into a transaction with his fellow TASCO shareholders whereby he exchanged his stock in TASCO for an assignment of TASCO's position in the VSL/TASCO contract, along with an assignment of the rights to a dormant corporation known as Hydra Industries, Inc. (Hydra). When VSL consented to this arrangement, Scharling and Hydra were able to step into the shoes of TASCO to supply the polypropylene fabric to VSL in accordance with the terms negotiated in the 1978 contract.
 
 
 7
 In order to raise capital and acquire a mill and looms, Scharling solicited Dominske's personal investment in Hydra. In 1981 Dominske agreed to invest $20,000 initially[1] and thus became owner of a 50% interest in Hydra.
 
 
 8
 In 1982 Contech sued VSL for patent infringement. The suit was settled, and as part of the settlement Contech assumed the VSL/TASCO/Hydra contract, unchanged. Thereby Contech became the only American source of polypropylene fabric forming systems. Dominske did not participate in this settlement, and Hydra, now Contech's supplier of polypropylene fabric, had no say in the settlement or the assumption of the contract.
 
 
 9
 The settlement bound Contech to the terms of the contract, including price, but no evidence was adduced to show that Contech attempted to renegotiate the 1978 price VSL had accepted. Under the terms of the license agreement, any fabrics woven under the teachings of the Villiger patent that Contech wished to purchase had to be purchased from Hydra, although Contech was not required to purchase any specified amount of fabric from Hydra. If Contech chose, it could purchase all of its fabric from other suppliers, such as C & A, which supplied Contech with nylon fabric not woven under the Villiger patent. The effective result of the settlement as to Hydra was that Contech, having eliminated VSL as competition, became Hydra's only customer for polypropylene fabric.
 
 
 10
 After the settlement negotiations with VSL were concluded and the written agreement executed, VSL gave Contech permission to offer jobs to Dominske and two other men. In the course of employment discussions with Bruce Lamberton, then president of Contech, Dominske asserts that he told Lamberton that he had an interest in Hydra, although he did not reveal that it was a 50% interest.[2] Contech hired Dominske as its National Marketing Manager.
 
 
 11
 Dominske's duties with Contech involved marketing and sales responsibilities and related functions, including making sales forecasts. Dominske did not take part in price negotiations with either of Contech's two suppliers, Hydra and C & A, or in the purchasing of fabric from either supplier. Fabric was ordered by means of blanket purchase orders executed by Lamberton or Frank Akers, Vice President and Treasurer of Contech. Dominske's responsibilities included checking invoices to ensure that the multiplication was correct and that there were no glaring errors in fabric styles or other such matters. Dominske worked in a sales office in Atlanta, while Contech's business decisions were made at its home office in Cleveland, Ohio.
 
 
 12
 In order to be able to market both nylon and polypropylene fabrics, Contech's management instituted a policy of proportioning equally the value of purchases from each of these two suppliers. Contech maintained a nearly equal division of its business between C & A and Hydra throughout the years that both companies produced fabric for Contech, with the exception of the final year, 1984. In that year C & A began selling the same type of nylon fabric it was producing for Contech to Contech's customers, thereby becoming Contech's direct competitor. Contech, understandably displeased, began reducing its orders with C & A and eventually stopped doing business with C & A altogether. In early 1985, Contech approached Hydra to request that Hydra begin weaving nylon. Hydra complied, although it was far more profitable for Hydra to weave polypropylene than nylon.[3] In this manner Hydra became Contech's sole supplier of all types of fabriform fabrics.
 
 
 13
 Contech agreed to purchase Hydra's inventory of both nylon and polypropylene, since Contech was Hydra's only customer and Hydra had neither the physical nor financial resources to accommodate holding an inventory of fabric sufficient to meet Contech's needs. Under this agreement, the fabric was woven at Hydra and then was transported to Contech's sewing facility, whereupon Contech was billed. In contrast, C & A maintained its own inventory and Contech was required to pay C & A before the fabric left the supplier. As Contech from time to time experienced severe cash flow problems, it was not unusual for Contech to be over ninety days in arrears in its payments to Hydra. In May 1984, Contech executed a promissory note in favor of Hydra for $200,000 in arrearages at 18% interest and a security agreement in the amount of Hydra's fabric. Scharling, not Dominske, was involved in negotiating the note and security agreement.
 
 
 14
 During the period 1982 through 1986, Hydra continued to supply Contech with polypropylene at the price established in the 1978 VSL/TASCO/Contech contract, in spite of the escalator clause which would have permitted Hydra to raise its price. Dominske maintains that his profits declined dramatically during this time, so that they were 40% less in 1984-85 than they were in 1982 before Dominske went to work for Contech. In 1985 and 1986, however, Dominske received $35,578.78 in "salary" from Hydra and $3874 in profit sharing and retirement. From June 30, 1981 to May 1, 1986, the Dominskes received over $470,000 from Hydra ($39,452.78 to Donald, $431,748.26 to his wife, Nelly[4]) in the form of "salary," travel, medical and supply reimbursements, interest on loans, and profit sharing and retirement.
 
 
 15
 Lamberton left Contech in 1985 and Donald Daczko became president. Dominske did not disclose his financial interest in Hydra to Daczko. In 1986 Dominske left Contech, having been terminated along with other personnel for the stated reason that Contech was forced to reduce its overhead. Subsequently, after receiving an assignment of the stock from his father, Dominske sold his ownership interest in Hydra.
 
 
 16
 In 1989 Contech filed an action in the United States District Court for the District of South Carolina, Greenville Division, against Donald Dominske, Nelly Dominske, Hydra, and Scharling.[5] Contech's complaint alleged, inter alia, that Donald Dominske breached his fiduciary duty to Contech by holding an undisclosed ownership interest in Hydra, and that Dominske's wife, Nelly, aided and abetted her husband's breach of fiduciary duty.[6]
 
 
 17
 After a four-day bench trial in April 1990, the district court held that the Dominskes were not liable to Contech.[7] The court found that Donald Dominske's interest in Hydra was not adverse to the interests of Contech, Dominske's principal, primarily because Dominske as a part owner of Hydra did not deal with Contech in an area connected with his agency. Even assuming that the parties' interests had been adverse, however, the court found that Dominske had fully disclosed his interest in Hydra to Contech and therefore had not breached his fiduciary duty to Contech. Contech appeals.
 
 II.
 
 18
 We review the question of whether Dominske's interest in Hydra constituted an interest adverse to Contech de novo, as a matter of the law of agency. Pizzeria Uno Corp. v. Temple, 747 F.2d 1522, 1526 (4th Cir.1984). The Restatement (Second) of Agency sets forth the principles of agency law applicable to this case, as follows:
 
 
 19
 Unless otherwise agreed, an agent is subject to a duty not to deal with his principal as an adverse party in a transaction connected with his agency without the principal's knowledge.
 
 
 20
 Restatement (Second) of Agency, Sec. 389 (1958); accord Fender v. Fender, 285 S.C. 260, 262, 329 S.E.2d 430, 431 (1985).
 
 
 21
 Unless otherwise agreed, an agent is subject to a duty to his principal to act solely for the benefit of the principal in all matters connected with his agency.
 
 
 22
 Restatement (Second) of Agency, Sec. 387 (emphasis added); accord Ramage v. Ramage, 283 S.C. 239, 322 S.E.2d 22 (S.C.Ct.App.1984).
 
 
 23
 The most commonly encountered type of adverse interest is that of an agent who is paid by a direct competitor of his principal. To the extent that the relationship between Contech and Hydra was not directly competitive and Dominske was not specifically hired to purchase fabric, this matter is in fact one of first impression in South Carolina and this Circuit. Adverse interest is nevertheless inherent in the rarer situation that is exemplified by the relationship between Contech and Dominske as part-owner of Hydra: a buyer-seller relationship between principal and agent. In such a relationship, an irreconcilable tension exists between the interest the buyer and seller each have in obtaining the maximum financial advantage for himself in dealing with the other, and the agent's duty to act solely to the principal's advantage in preference to his own. Absent full disclosure to the principal, this tension renders fully faithful agency impossible even if no actual fraud is involved, but the temptation to commit fraud in such a situation is so difficult to avoid that the law forbids an agent to "buy from or sell to himself." Restatement (Second) of Agency Sec. 389 comment a (1958); accord Mathewson v. Clarke, 47 U.S. (6 How.) 122, 143, 12 L.Ed. 370 (1848) (the law requires not only bona fide action of an agent, but that he shall be free from selfish motives conflicting with the interests of his principal); Missouri Highway & Transportation Commission v. Sample, 702 S.W.2d 535, 537-38 (Mo.App.1985) (appraiser, as supplier of services, was in adverse position to his employer, as purchaser of services).
 
 
 24
 The district court recognized the adversity of interest inherent in the buyer-seller relationship between principal and agent, but nevertheless found that in the circumstances of the present case no actual adverse interest was manifest. Yet it is clear that Dominske was in a position to advise Contech how much and what kind of fabric to buy from Hydra, whether or not Dominske actually took advantage of this position. The court's finding contradicts the implication of the Restatement (Second) of Agency that the buyer-seller relationship is per se adverse, whatever the circumstances of the individual case:
 
 
 25
 The rule ... forbids the doing of acts in competition with the principal and the acquisition of interests adverse to him....
 
 
 26
 Restatement (Second) of Agency Sec. 387 comment a (1958) (emphasis added).
 
 
 27
 [T]he agent commits a breach of duty to his principal by acting for another in an undertaking which has a substantial tendency to cause him to disregard his duty to serve his principal with only his principal's purposes in mind.
 
 
 28
 Id. at Sec. 384 comment a (emphasis added).
 
 
 29
 Unless otherwise agreed, an agent who makes a profit in connection with transactions conducted by him on behalf of the principal is under a duty to give such profit to the principal.
 
 
 30
 Id. at Sec. 388. See also United States v. King, 469 F.Supp. 167, 171 (D.S.C.1979).
 
 
 31
 The district court based its conclusion on three factors: (1) that the deal between Hydra and Contech was bargained for in all material respects prior to Dominske's becoming a Contech employee; (2) that Dominske could not have influenced Contech's purchases from Hydra through his sales activities and forecasts; and (3) that the scope of Dominske's agency did not include activities which would implicate his interest in Hydra.
 
 
 32
 First, the timing of the deal, and whether or not Dominske negotiated it, are matters at best tangential to the undeniable fact that whenever Dominske acceded to the status of agent for Contech he was in a position to profit from whatever deal had been previously negotiated regarding transactions between Contech and Hydra. Likewise, whether the price of the fabric was raised, was lowered, or stayed the same does not alter the fact that, whatever the sales price, Dominske would receive a 50% split of the profits.
 
 
 33
 Second, although Dominske did not directly purchase the fabric from Hydra, as National Sales Manager for Contech he was in a position to influence the type and quantity of fabric Contech bought from Hydra. It is true that, while Contech was purchasing from both C & A and Hydra, a policy was maintained of purchasing equal amounts from each. Nevertheless, the record also shows that Dominske persistently touted the merits of polypropylene over nylon to Lamberton, who preferred nylon, in an apparent attempt to get the policy changed so that Contech would buy more polypropylene. Moreover, as a salesman Dominske was in a position to influence the choice of fabric made by customers, and by means of his sales forecasts he could influence the amount of inventory purchased by Lamberton. The court relied on the testimony of Phillip Davis, a Contech management employee with responsibility for inventory, who stated that Dominske's forecasts were generally accurate. Nevertheless, the incentive for Dominske to inflate them was present and could be acted on at any time.
 
 
 34
 Finally, the district court determined that the scope of Dominske's agency was limited to matters touching upon his duties as Contech's national marketing director. Yet as a high management-level sales employee acting on a national level, Dominske's duties allowed him the capacity to influence purchasing even though he did not have the direct responsibility for purchasing. The Restatement defines an agent's fiduciary duty in broad terms: "to act primarily for the benefit of [one's principal] in matters connected with his undertaking." Restatement (Second) of Agency Sec. 13, comment a (1958) (emphasis added). The court's characterization of the scope of Dominske's agency as too narrow to encompass Contech's inventory acquisition takes no account of the functional interactions and interdependence among higher management in a small corporation such as Contech. Moreover, the court's cursory analysis ignores the fact that the fiduciary relationship arises not only from the formal principal-agent contract, but also from informal relationships of trust. Naviera Despina, Inc. v. Cooper Shipping Co., 676 F.Supp. 1134, 1141 (S.D.Ala.1987).
 
 
 35
 We think that such a narrow interpretation of agency would greatly restrict an agent's fiduciary duty, while placing the burden on principals to prescribe rigidly separate and extensively categorized employee duties as well as all prohibited outside interests. The district court's interpretation conflicts with the Restatement's broad definition of an agent's fiduciary duty, as well as its placement of the burden on the agent not to act adversely to his principal. We find, as a matter of law, that the situation in which Dominske placed himself when, as part owner of Hydra, he became an employee of Hydra's sole customer is a situation in which the presence of adverse interests threatens the fiduciary relationship between principal and agent.
 
 III.
 
 36
 To find that an adverse interest between principal and agent exists, however, is not necessarily to find that a breach of the fiduciary duty owed to the principal by the agent has occurred. The law does not absolutely prohibit an agent from dealing with his principal in matters connected with the agency--as long as the agent discloses his interest to the principal and the principal, possessing the necessary material knowledge, consents.
 
 
 37
 An agent who, to the knowledge of the principal, acts on his own account in a transaction in which he is employed has a duty to deal fairly with the principal and to disclose to him all facts which the agent knows or should know would reasonably affect the principal's judgment, unless the principal has manifested that he knows such facts or that he does not care to know them.
 
 
 38
 Restatement (Second) of Agency Sec. 390 comment a (1958).
 
 
 39
 The district court made the factual finding that Dominske fully disclosed his interest in Hydra to Lamberton prior to the time Contech employed Dominske. The court's conclusion was based on Dominske's testimony and the testimony of Phillip Davis that Lamberton told him that Lamberton knew of Dominske's interest in Hydra.
 
 
 40
 Contech presented evidence to show that Dominske tried to hide his interest in Hydra, including the testimony of certain Intrusion Prepakt employees that, upon questioning, Dominske denied having any such interest.[8] Yet none of this evidence contradicts the testimony of Dominske and Davis regarding the disclosure to Lamberton, who as Contech's president was Dominske's principal. We defer to the district court's credibility assessment in favor of the Dominske testimony.
 
 
 41
 The fact that Dominske did not reveal to Lamberton the extent of his interest is not relevant; Dominske stood to profit from transactions with Contech regardless of the percentage of his interest. Likewise, Dominske's failure to disclose to Daczko, who became Contech's president after Lamberton left, is not legally significant since Contech was deemed to know the information once Dominske disclosed to Lamberton. Piedmont Press Ass'n v. Record Pub. Co., 156 S.C. 43, 152 S.E. 721 (1930). Dominske's hiring by Lamberton and his continuation of his interest in Hydra while employed by Contech indicate that Contech consented to Dominske's connection with Hydra.
 
 
 42
 The district court's finding that Dominske disclosed his interest in Hydra to Contech is a finding of fact, not to be set aside unless clearly erroneous. Fed.R.Civ.P. 52(a). "A finding is clearly erroneous when, although there is evidence to support it, on the entire evidence the reviewing court is left with the definite and firm conviction that a mistake has been committed." Faulconer v. Commissioner, 748 F.2d 890, 895 (4th Cir.1984). We cannot say that the district court's finding in this case was clearly erroneous. We therefore hold that the district court's judgment is
 
 
 43
 AFFIRMED.
 
 
 
 [1]
 Dominske acquired his Hydra stock through his father, Carl Dominske, in a "straw man" transaction. The stock, paid for by Donald, was issued in Carl's name and Hydra issued a debenture to Carl promising to pay the portion of the $20,000 designated as "loan." Carl transferred the stock to Donald over six years later, after Donald had left Contech. Donald Dominske sold his stock in Hydra to Scharling in 1987
 
 
 [2]
 Lamberton retired from Contech in 1985 and died in 1988 prior to the commencement of this action
 
 
 [3]
 Contech alleges that it made more money selling C & A's nylon because Hydra's price for its nylon was three cents per square foot higher than C & A's. This, together with the fact that the nylon price was not covered by the VSL/TASCO/Hydra/Contech contract, implies that Dominske may have profited from the setting of Hydra's price for nylon. Yet Contech itself reported that Hydra made a profit per millyard of nylon of only 66 cents, and that Scharling's projections showed that Hydra would lose $91,200 a year weaving nylon. It appears that, even if Contech is correct, there would be no profits for Dominske to disgorge as the result of nylon sales to Contech
 
 
 [4]
 Nelly Dominske served as a "consultant" to Hydra, earning $30,000 per year plus "expenses." Her primary service to Hydra seems to have been signing checks. According to Scharling, her compensation was actually a split of Hydra's profits
 
 
 [5]
 Defendants Hydra and Scharling were dismissed from the lawsuit following voluntary pretrial settlement
 
 
 [6]
 The complaint also alleged that Donald Dominske breached an implied covenant of good faith and fair dealing arising out of his employment. Finding that Dominske was an at will employee, the district court concluded that South Carolina courts would find such a covenant inconsistent with at will employment. The court held that, even were a duty of good faith and fair dealing applicable in this situation, Dominske did not breach it. This aspect of Contech's complaint was not at issue during oral argument
 
 
 [7]
 At oral argument, Contech conceded that any liability of Nelly Dominske was necessarily derivative of a finding of liability on the part of Donald Dominske
 
 
 [8]
 In late March 1984, Dominske was questioned by Terrence Tucker, the district manager of Intrusion Prepakt's Turnersville, New Jersey office, as to whether he had an interest in Hydra. Tucker testified that Dominske vehemently denied any involvement with Hydra. Dominske denied that this and another similar conversation with Prepakt employee Georg Bergemann took place