DECISION AND JOURNAL ENTRY
{¶ 1} Appellant, the State of Ohio, appeals from an order of the Akron Municipal Court which granted a motion to suppress made by criminal defendants Jeremiah Biehl and Mark Ingersoll. We reverse.
 I. {¶ 2} At approximately 11:30 p.m. on the evening of February 6, 2004, Officer Aaron Burnette of the University of Akron Police Department was on routine patrol. Officer Burnette was driving alone in the vicinity of the University of Akron campus, when he saw three people standing near a car in the parking lot of a private apartment complex. Although this parking lot is not on University property, under a Mutual Aid Agreement between the University and the City of Akron, the University of Akron's security officers may exercise police power on properties beyond the University confines, so long as they are within the specified geographic boundaries of the Agreement. Believing this particular parking lot to be within the prescribed boundaries, Officer Burnette turned his full attention on these three individuals and decided to investigate.
 {¶ 3} As Officer Burnette drove into the lot, he saw one of the three people bend over, put an object on the ground, and walk away from the group. As he approached, Officer Burnette recognized the object as a can of beer and the three subjects as young men, two of whom are now the appellees in this case. Officer Burnette exited his car to question the young men as to their purpose for being there, to which they responded that they had been attending a party across the street and were merely socializing. Almost immediately upon confronting these three young men, Officer Burnette noticed that they smelled of alcohol and ordered that they produce identification. All three men were under the age of 21. Two other officers arrived, and Officer Burnette then commenced a pat-down search of the three suspects to ensure officer safety. It was not reported whether these two officers were University of Akron or City of Akron police officers, but it is clear that Officer Burnette maintained the primary role during the ensuing encounter. It is undisputed that none of the suspects consented to the search.
 {¶ 4} At the suppression hearing, Officer Burnette testified that the three suspects initially drew his attention because they "appeared to be suspicious in nature," but conceded that nothing particular in their conduct or appearance suggested such a conclusion. Rather, on direct examination, Officer Burnette testified that his suspicion was aroused entirely because of vague reports of recent car break-ins in the area. However, on cross-examination, Officer Burnette conceded that on approaching the suspects, he initially told them that his concern stemmed from reported drug activity in the area, and that he had immediately accused them of engaging in drug activity. Then, on further cross-examination, Officer Burnette retreated from both the break-in and drug activity theories, and insisted that once he saw the open beer can on the ground he was investigating underage drinking. He went on to explain that this was why he ordered the young men to produce identification, even though he did not know who had actually placed the beer can on the ground and the men had explained that they had been at a party across the street. Finally, Officer Burnette testified repeatedly, on both direct and cross-examination, that he performed the pat-down searches to ensure his personal safety.
 {¶ 5} However, the trial court seemed to conclude that Officer Burnette patted down Mr. Ingersoll and Mr. Biehl in a search for alcohol, either because they denied they had been drinking or because they refused to answer his questions. As the trial court found, Officer Burnette began by patting down Mr. Ingersoll, found a can of beer in his pocket, and arrested him for being a minor in possession of alcohol. Next, Officer Burnette patted down Mr. Biehl. Although Officer Burnette did not find alcohol in Mr. Biehl's possession, he smelled alcohol on Mr. Biehl's breath, and arrested him for minor in possession (consumption). However, during the search, Officer Burnette found the keys to Mr. Beihl's car, and walked over to the locked car. Without any form of consent, Officer Burnette unlocked Mr. Biehl's car and searched the interior and then the trunk, where he found a case of beer. When the third suspect admitted to having drunk four beers that night, Officer Burnette released him with a warning.
 {¶ 6} Thereafter, Mr. Biehl and Mr. Ingersoll were charged with violating R.C. 4301.69(E)(1), possession of alcohol by an underage person, a first degree misdemeanor. See R.C. 4301.99(C). They entered pleas of not guilty, and filed a motion to suppress the evidence seized from the encounter with Officer Burnette. The trial court conducted a hearing on this motion, during which Officer Burnette and Mr. Biehl testified. In ruling on the motion, the trial court discussed potential extraterritoriality issues of the arresting officer's jurisdiction, but founded its decision on the basic premise that investigative stops must be supported by reasonable suspicion of criminal activity, based on specific and articulable facts. Specifically, the court stated, "Officer Burnette had no reasonable suspicion of criminal activity on behalf of Defendants to justify approaching them." Thus, after expressing its own factual findings regarding the encounter, the court refuted the State's argument that the approach was justified on the basis that the parking lot was a high crime area, based on the court's finding an insufficiency of supporting fact. In concluding its order, the trial court expressly found that there were simply "not enough specific and articulable facts" to justify the search or seizure. Therefore, the motion to suppress was granted.
 {¶ 7} The State timely appealed, asserting three assignment of error. Because the third assignment of error is ultimately dispositive of the issue, we will address it first and render the other two issues moot.
 II. A. Third Assignment of Error
"The trial court erred in finding that the arresting officer had no reasonable suspicion of criminal activity on behalf of the defendants-appellees to justify approaching them."
 {¶ 8} In this assignment of error, the State asserts that the trial court erred by suppressing the evidence collected from the investigatory stop, in that it was a justified encounter and a lawful search. We agree.
 {¶ 9} A motion to suppress evidence under the Fourth Amendment involves mixed questions of law and fact. Ornelas v.United States (1996), 517 U.S. 690, 696-97, 134 L.Ed.2d 911;State v. Booth, 151 Ohio App.3d 635, 2003-Ohio-829, at ¶ 12. Therefore, this Court grants deference to the trial court's findings of fact, but conducts a de novo review of whether the trial court applied the appropriate legal standard to those facts. Id. Thus, we review "findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers."State v. Jones (Mar. 13, 2002), 9th Dist. No. 20810, quotingOrnelas, 517 U.S. at 699. Because the trial court "is in the best position to resolve questions of fact and evaluate credibility of witnesses[, an] appellate court, therefore, is bound to accept a trial court's factual findings that are supported by competent, credible evidence." (Internal citations and quotations omitted.) Akron v. Bowen, 9th Dist. No. 21242, 2003-Ohio-830, at ¶ 5. After allowing for the officers' reasonable inferences and acknowledging the trial court's superior position in weighing the facts, we "decide whether, under a standard of objective reasonableness, those facts would give rise to a reasonable suspicion justifying a stop or probable cause to search." (Internal citations and quotations omitted.)State v. Reed (Aug. 21, 1996), 9th Dist. No. 17635.
 {¶ 10} Next, we recognize that police officers may engage citizens in conversation without such questioning necessarily becoming a detention. Florida v. Royer (1983), 460 U.S. 491,497, 75 L.Ed.2d 229; State v. Lawson, 9th Dist. No. 21227, 2003-Ohio-1299, at ¶ 12. Furthermore, the officers need not expressly inform the citizen of the right to decline cooperation, or that they are free to leave. United States v. Mendenhall
(1980), 446 U.S. 544, 555, 64 L.Ed.2d 497; Ohio v. Robinette
(1996), 519 U.S. 33, 39-40, 136 L.Ed.2d 347.
"Even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual, ask to examine the individual's identification, and request consent to search his or her luggage, as long as police do not convey a message that compliance to their requests is required." (Internal edits omitted.) Reed, supra, quoting Florida v.Bostick (1991), 501 U.S. 429, 434-35, 115 L.Ed.2d 389.
However, the critical premise underlying this right to approach an individual is the understanding that "the person stopped is not obliged to answer, answers may not be compelled, and refusal to answer furnishes no basis for an arrest." Terry v. Ohio
(1968), 392 U.S. 1, 34, 20 L.Ed.2d 889 (White, J., concurring).
 {¶ 11} Therefore, not every interaction between an officer and an individual is necessarily a seizure. "A `seizure' occurs only where the officer, through force or show of authority, has restrained the liberty of a person." Reed, supra. In the present case, Officer Burnette appropriately engaged the appellees in conversation, asked for identification and requested consent to search. See Bostick, 501 U.S. at 434-35. However, it is notable that this encounter with these appellees was confrontational from the outset, as demonstrated by Officer Burnette's own testimony. While he originally approached them with a suspicion that they were breaking into cars, he immediately accused them of drug activity and just as quickly turned his attention to underage drinking and demanded their identification. When he requested consent to search, the appellees refused. Thus, consistent with the trial court's conclusion that Officer Burnette conducted the patdown in response to their refusal to answer his questions, the facts indicate that the appellees were not free to walk away and that the encounter was a seizure from that point forward. Thus, while we may conclude that the initial approach falls within the bounds of a consensual encounter, we must determine the reasonableness of the ensuing seizure and subsequent search.
 {¶ 12} As the United States Supreme Court expressed, "in determining whether the seizure and search were `unreasonable' our inquiry is a dual one-whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." Terry, 392 U.S. at 19-20. Accord State v.Andrews (1991), 57 Ohio St.3d 86, 87 (stating that "we must analyze: (1) the investigatory stop, and (2) the protective search"); Jones, supra (applying the two-step analysis).
"The typical Terry stop entails a brief detention sufficient for the police to ask questions pertaining to the suspicious circumstances. However, an officer does not have authority to automatically conduct a search of a detainee when a valid stop has been initiated. In order to conduct a patdown search for weapons, an officer must have reason to believe that an individual is armed and dangerous. * * * Reasonableness is not determined by inchoate and unparticularized suspicions but rather by specific reasonable inferences an officer is entitled to draw from the circumstances in light of his experiences. This will enable an officer to pursue an investigation absent fear of violence. The limited search is not intended to provide theofficer with an opportunity to discover evidence of a crime." (Emphasis added; Internal citations and quotations omitted.)Bowen at ¶ 9. Simply stated, the "purpose of a Terry stop is not to accuse, but to investigate." Jones, supra. See, also,State v. Dietry, 9th Dist. No. 03CA0052, 2004-Ohio-2661, ¶ 6 (warning against a valid search escalating beyond its allowable limit).
 {¶ 13} The reasonable suspicion necessary to justify an investigatory stop requires that the officers must be able to point to "specific and articulable facts" warranting a rational belief that criminal behavior is imminent. Terry,392 U.S. at 21. Accord Andrews, 57 Ohio St.3d at 87. We will not condone "intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches." Terry,392 U.S. at 22. Thus, reasonable suspicion is measured by an objective standard: "would the facts available to the officer at the moment of the seizure * * * `warrant a man of reasonable caution in the belief' that the action taken was appropriate?"State v. Bobo (1988), 37 Ohio St.3d 177, 178-79, quotingTerry, 392 U.S. at 21-22.
 {¶ 14} The Ohio Supreme Court has identified certain specific and articulable facts to justify an investigatory stop by way of reasonable suspicion, factors which fall into four general categories: (1) location; (2) the officer's experience, training or knowledge; (3) the suspect's conduct or appearance; and (4) the surrounding circumstances. Bobo, 37 Ohio St.3d at 178-79;Andrews, 57 Ohio St.3d at 87-88. No single factor is dispositive; the decision must be viewed based on the totality of the circumstances. Bobo, 37 Ohio St.3d at paragraph one of the syllabus; State v. Lively (July 7, 1997), 9th Dist. No. 2632-M;State v. Davison, 9th Dist. No. 21825, 2004-Ohio-3358, at ¶ 6, 15.
 {¶ 15} Location relates to whether the confrontation occurs in a reputed "high crime" area, an area of known drug activity, or perhaps a location under police surveillance. Bobo,37 Ohio St.3d at 178-79 (heavy drug activity); Andrews,57 Ohio St.3d at 88 (high crime); Lively, supra (officer specifically monitoring a school to prevent vandalism). But, see, State v.Crosby (1991), 72 Ohio App.3d 148, syllabus (holding that individuals talking in or near a car, even when parked in an area known for drug activity, does not, without more, justify a search); Fairlawn v. Skoblar (1997), 122 Ohio App.3d 464,467-68 (holding prior incidents of vandalism in a cemetery insufficient to justify a search of late-night visitors); Statev. Davis (2000), 140 Ohio App.3d 659, 664-65 (stating that merely departing a house that is under surveillance is insufficient to justify a search).
 {¶ 16} The officer's experience carries certain authority.Terry, 392 U.S. at 5 (officer had 39 years of experience);Bobo, 37 Ohio St.3d at 178-79 (20 years); Andrews,57 Ohio St.3d at 88 (12.5 years). Alternatively, an officer may be aware of particular crime or danger in the vicinity, or have particularized knowledge of how crimes, such as drug transactions, occur in the area. Bobo, 37 Ohio St.3d at 178-79;Davison at ¶ 9 (officer had previously arrested the suspect for a shooting incident, at which time the suspect had been armed).
 {¶ 17} The suspect's conduct or appearance includes suspicious, inexplicable or furtive movements, such as watching-out, ducking, hiding, fleeing, or discarding an object.Bobo, 37 Ohio St.3d at 178-79 (suspect ducking out of sight and other furtive movements); Andrews, 57 Ohio St.3d at 88 (suspect running through a dark courtyard threw an object to the ground);Lively, supra (activities indicative of anticipated vandalism);State v. Lee (1998), 126 Ohio App.3d 147, 148 (cracked and burnt lips indicative of smoking crack cocaine).
 {¶ 18} The surrounding circumstances include the time of day or night, because certain activities would not ordinarily occur late at night or because weapons would be less obvious in the dark. Bobo, 37 Ohio St.3d at 178-79 (night); Andrews,57 Ohio St.3d at 88 (after nightfall, in a darkened area). Circumstances may also include an officer being out of a vehicle, away from protection, or without backup. Bobo, 37 Ohio St.3d at 178-79;Andrews, 57 Ohio St.3d at 88.
 {¶ 19} In the present case, the State relies heavily on its knowledge that the parking lot where the encounter took place was a high crime area. In a similar situation, this Court previously affirmed a trial court's grant of a motion to suppress by refusing to give controlling authority to this single factor, stating:
"This is the type of situation the Fourth Amendment was meant to protect against. The fact that the Defendant and two other persons were pulling out of a cemetery late at night does not provide facts sufficient for an investigatory stop. Although there had been problems in the past with vandalism, this does not give license to an officer to seize motorists." Fairlawn,122 Ohio App.3d at 467. Accordingly, we refuse to afford extra emphasis to the purported "high crime" status of the parking lot in the present case. We must also look to the other factors.
 {¶ 20} Officer Burnette testified that he had been with the University of Akron Police Department for five years. While we realize that this is not the equivalent of the officers in those cases cited above, we think it is sufficient to establish that Officer Burnette had proper training and practical experience in recognizing potential criminals and negotiating potential criminal situations. While we also expect that, as an employee of the University of Akron, Officer Burnette's experience would aid him in recognizing these particular young men as college students socializing outside of a party, this would not prevent them from being, or appearing to be, criminals. Thus, Officer Burnette's experience would tend to support his reasonable suspicion.
 {¶ 21} Officer Burnette testified that nothing in their conduct or appearance, other than their presence in the parking lot, gave rise to his opinion that they "appeared to be suspicious in nature." The only action he cited was that one of the men placed something on the ground. They were not on the lookout for his approach; they were standing in plain sight. They did not flee when he approached; they awaited him and, at first, answered his inquiries. They did not display a dangerous or threatening appearance; they explained they had recently left a nearby party. They made no furtive or inexplicable movements; they merely refused his request that they consent to a search. However, these three were lurking in a parking lot where at least one other break-in had occurred, without any evident purpose for being there. Upon his approach, Officer Burnette recognized the item on the ground, placed by one of the suspects, to be a can of beer. Furthermore, after exiting his car he noticed that the boys had reddened eyes and smelled of beer. At this point, Officer Burnette felt that he had reasonable suspicion to search them.
 {¶ 22} Finally, we consider the surrounding circumstances. Although it was not particularly dark, it was almost midnight. Officer Burnette testified that there was snow on the ground and, on cross-examination, insisted that the parking lot was well lit. However, he also testified that he pats down everyone he confronts in the dark, for his own safety. Although Officer Burnette had two other officers present to provide backup, he was out of his vehicle and it was possible that at least one of these boys, who had already established their belligerence by refusing to answer his questions or consent to the search, might choose to respond with violence or at least attempt to flee into the surrounding darkness. Therefore, Officer Burnette's testimony can be read to support his reasonable suspicion.
 {¶ 23} Looking at the totality of the circumstances, we must disagree with the trial court that the evidence before us lacks a sufficient basis to justify even the initial approach. That is, this Court finds that these facts satisfy the requirements of reasonable suspicion. In so doing, we also recognize that the "Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape." (Internal quotations omitted.) Bobo,37 Ohio St.3d at 180, quoting Adams v. Williams (1972),47 U.S. 143, 145-46, 32 L.Ed.2d 612. Thus, allowing for Officer Burnette's reasonable inferences, we conclude that the trial court erred in suppressing this evidence.
 {¶ 24} In Akron v. Bowen, supra, this Court affirmed the suppression of evidence, even though seized during a valid investigatory stop, because the ensuing search was not justified. We applied the two-part test as follows:
"Although there was reasonable suspicion to conduct an investigatory stop of Defendant's vehicle, there was no reasonable suspicion, based on the totality of the circumstances, that Defendant was armed. While Officer Schismenos stated that Defendant's vehicle was stopped for suspicious activity, he also remarked that `all [he] knew is she could have been casing the place for suspected robbers * * * [or] maybe conducting some type of drug traffic.' Officer Schismenos did not relay any facts that would lead a reasonable individual to believe that his safety was jeopardized. Thus, the Officer was not entitled to initiate a protective search for the safety of himself and others." (Internal citations omitted.) Bowen at ¶ 14.
Looking to the record, we find that Officer Burnette testified that he conducted the pat-down searches for the protection of himself and others.
 {¶ 25} On the one hand, the Ohio Supreme Court has explained that the "frisk, or protective search, approved in Terry is limited in scope to a pat-down search for concealed weapons when the officer has a reasonable suspicion that the individual whose behavior he is investigating at close range may be armed and dangerous." Andrews, 57 Ohio St.3d at 89, citing Terry,392 U.S. at 27. However, on the other hand, we also recognize that the United States Supreme Court has expanded the bounds of such a search by way of the "plain feel" doctrine:
"If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context." Minnesota v. Dickerson
(1993), 508 U.S. 366, 375-76, 124 L.Ed.2d 334 (relying on the obviousness of the object's "incriminating character"). But, see,Dietry at ¶ 7 (the feel of the object does not require absolute certainty).
 {¶ 26} When Officer Burnette performed his pat down of Mr. Ingersoll, he found a can of beer in his pocket. Because Mr. Ingersoll was underage, this beer was contraband. We conclude that the trial court improperly suppressed this evidence.
 {¶ 27} When Officer Burnette patted down Mr. Biehl, he did not find a similar can of beer in Mr. Biehl's possession, or any other alcohol. However, Officer Burnette smelled alcohol on Mr. Biehl's breath, and deeming this probable cause, promptly arrested Mr. Biehl for possession/consumption per R.C.4301.69(E)(1). See State v. Nichols, 3rd Dist. No. 13-03-75,2004-Ohio-2355, at ¶ 3; State v. Roop (June 4, 1993), 3rd Dist. No. 2-93-1. Incident to this arrest, Officer Burnette again searched Mr. Biehl and found the keys to his car. Thereupon, Officer Burnette unlocked Mr. Biehl's car and proceeded to search the interior and then the trunk, where he found beer. SeeThornton v. United States (2004), ___ U.S. ___,158 L.Ed.2d 905, 914 (upholding a vehicle search incident to arrest, even when the suspect is encountered outside of the vehicle), extending New York v. Belton, 453 U.S. 454, 69 L.Ed.2d 768
(upholding search of a vehicle incident to arrest); State v.Murrell (2002), 94 Ohio St.3d 489, syllabus. See, also, UnitedStates v. Ross (1982), 456 U.S. 798, 824 (holding that probable cause to search the car extends to the entire car). Therefore, we conclude that the trial court improperly suppressed this evidence.
 {¶ 28} The State's assignment of error is sustained.
 B. First Assignment of Error
"The trial court committed prejudicial error by suppressing evidence on grounds which were not raised in defendants-appellees' motion to suppress evidence."
 Second Assignment of Error
"The mutual aid agreement between the university of akron and the city of akron is a valid contract pursuant to R.C. 3345.041. Because the encounter between officer burnette and the defendants-appellees occurred within the geographic boundaries contained in the mutual aid agreement, the trial court erred in ruling officer burnette's stop of the defendants-appellees `Extra-Territorial'."
 {¶ 29} In its other assignments of error, the State challenges the trial court's raising of and finding on the issue of the officer's territorial jurisdiction. Because our decision in the above assignment of error is dispositive on the propriety of the motion to suppress, it is unnecessary to address these other assignments of error. As such, the State's first and second assignments of error are rendered moot. See App.R. 12(A)(1)(c).
 III. {¶ 30} The State's third assignment of error is sustained, and its first two assignments of error are not addressed. The order of the Akron Municipal Court is reversed and the cause is remanded for further proceedings consistent with this decision.
Judgment reversed, and cause remanded.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Akron Municipal Court, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to Appellee.
Exceptions.
Slaby, J. concurs.
Carr, P.J. concurs in judgment only.