[Cite as *State v. McLemore*, 2014-Ohio-2116.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

STATE OF OHIO

    Appellant

    v.

MAQUAINE S. MCLEMORE

    Appellee

C.A. No.     13CA010435

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF LORAIN, OHIO
CASE No.    11CR082864

DECISION AND JOURNAL ENTRY

Dated: May 19, 2014

HENSAL, Presiding Judge.

{¶1} Appellant, the State of Ohio, appeals from the judgment of the Lorain County Court of Common Pleas, granting Appellee, Maquaine McLemore's, motion to suppress. This Court reverses.

I.

{¶2} At approximately 12:30 p.m. on May 3, 2011, the Lorain Police Department received a call that shots had been fired at the 1400 block of West 17th Street. The caller, Joshua Brewer, reported having seen a black male wearing dark jeans and a dark, hooded sweatshirt running from the area and heading "in a southwesterly direction towards the projects." In responding to the scene, Officer Jeffrey Smith encountered a black male, dressed in jeans and a black t-shirt, near the corner of West 19th Street and Pole Avenue. Officer Smith stopped the man, whom he identified as Mr. McLemore, and ultimately detained him based on his observations during their encounter.

{¶3} Officers who responded directly to the 1400 block of West 17th Street found a single victim lying in the street near a car. The victim, who had suffered several gunshot wounds, was deceased by the time the officers arrived. After the police spoke with Mr. Brewer, the man who had called 911, Officer Smith brought Mr. McLemore to a nearby location so that Mr. Brewer could try to identify him. Mr. Brewer was unable to identify Mr. McLemore as the man he saw running, but the police continued to detain Mr. McLemore. Subsequently, the police found a black, hooded sweatshirt on West 18th Street, nearby the area where Officer Smith first had spotted Mr. McLemore. Mr. McLemore was then taken to the police station for questioning.

{¶4} Mr. McLemore was Mirandized for the first time at the police station. After indicating that he no longer wished to talk, the police asked for and obtained Mr. McLemore's consent for a search of his person. The police discovered the key to the shooting victim's car in Mr. McLemore's pocket. They also discovered a discarded firearm nearby the black, hooded sweatshirt on West 18th Street and had a member of the K-9 unit attempt to track a scent from the sweatshirt. The K-9 tracked a scent from the sweatshirt to the spot where Officer Smith stopped Mr. McLemore. Following further interrogation, Mr. McLemore confessed to having shot the victim while the two were engaged in a drug deal.

{¶5} A grand jury indicted Mr. McLemore on counts of murder, felony murder, felonious assault, tampering with evidence, drug trafficking, possession of drugs, two counts of having weapons while under disability, and several firearm specifications. Subsequently, Mr. McLemore filed several motions to suppress and supplements to his motions, and the State filed briefs in opposition. The trial court held a suppression hearing on Mr. McLemore's motions and later held another hearing at the State's request to permit additional testimony. The trial court ultimately concluded that the State had arrested Mr. McLemore without probable cause, in

violation of his Fourth Amendment rights. Consequently, the court suppressed all of the evidence flowing from Mr. McLemore's illegal arrest.

{¶6} The State now appeals from the trial court's suppression ruling and raises two assignments of error for our review. For ease of analysis, we rearrange the assignments of error.

II.

ASSIGNMENT OF ERROR II

THE TRIAL COURT ERRED IN GRANTING [MR.] McLEMORE'S MOTION TO SUPPRESS ON ITS FINDING THAT THERE WAS NO PROBABLE CAUSE TO ARREST [MR.] McLEMORE.

{¶7} In its second assignment of error, the State argues that the trial court erred by granting Mr. McLemore's motion to suppress. Specifically, it argues that the court erred by concluding that, under the totality of the circumstances, the police lacked probable cause to arrest Mr. McLemore. We agree.

{¶8} The Ohio Supreme Court has held that:

[a]ppellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses. Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard.

(Citations omitted.) *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8.

{¶9} The Fourth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, prohibits unreasonable searches and seizures. *Accord* Ohio Constitution, Article I, Section 14. This Court has identified three types of police encounters in the context of the Fourth Amendment: (1) consensual encounters; (2) investigatory stops; and (3) seizures that equate to an arrest. *State v. Patterson*, 9th Dist. Summit No. 23135, 2006-Ohio-

5424, ¶ 11. Consensual encounters do not trigger Fourth Amendment guarantees "unless the police officer has by either physical force or show of authority restrained the person's liberty so that a reasonable person would not feel free to decline the officer's requests or otherwise terminate the encounter." *Id.* at ¶ 12, quoting *State v. Taylor*, 106 Ohio App.3d 741, 747-748 (2d Dist.1995). "In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person." *United States v. Mendenhall*, 446 U.S. 544, 555 (1980).

{¶10} To justify an investigative stop, "an officer must be able to point to 'specific and articulable facts, which taken together with rational inferences from those facts,' support a reasonable suspicion of criminal activity." *State v. Farrey*, 9th Dist. Summit No. 26703, 2013-Ohio-4263, ¶ 8, quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968). *Accord Maumee v. Weisner*, 87 Ohio St.3d 295, 299 (1999). In evaluating the facts and inferences supporting the investigatory stop, a court must consider the totality of the circumstances as "viewed through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training." *State v. Bobo*, 37 Ohio St.3d 177, 179 (1988), quoting *United States v. Hall*, 525 F.2d 857, 859 (D.C.Cir.1976). A totality of the circumstances review includes consideration of "(1) [the] location; (2) the officer's experience, training or knowledge; (3) the suspect's conduct or appearance; and (4) the surrounding circumstances." *State v. Biehl*, 9th Dist. Summit No. 22054, 2004-Ohio-6532, ¶ 14, citing *Bobo* at 178-179.

{¶11} A seizure that equates to an arrest goes beyond a mere investigatory detention and requires the existence of probable cause. *Patterson* at ¶ 14. "The magic words 'you are under arrest' are not necessary to constitute an arrest." *State v. Maurer*, 15 Ohio St.3d 239, 255 (1984). Instead, "[t]he existence of an arrest is dependent * * * upon the existence of four requisite

elements: (1)[a]n intent to arrest, (2) under real or pretended authority, (3) accompanied by an actual or constructive seizure or detention of the person, and (4) which is so understood by the person arrested." *State v. Barker*, 53 Ohio St.2d 135 (1978), paragraph one of the syllabus. "Officers have probable cause to justify an arrest if 'from the information known to the arresting officers based on reasonably trustworthy information, a reasonably prudent person would be warranted in believing that the arrestee had committed or was committing an offense.'" *State v. Oliver*, 9th Dist. Summit No. 24500, 2009-Ohio-2680, ¶ 10, quoting *State v. Scott*, 9th Dist. Lorain No. 08CA009446, 2009-Ohio-672, ¶ 11.

{¶12} Officer Jeffrey Smith testified as a patrol officer with almost 27 years of experience. He testified that, at about 12:30 p.m., he received a dispatch concerning a shooting at 1427 W. 17th Street. The dispatcher indicated that the caller, Mr. Brewer, had seen a black male wearing a black, hooded sweatshirt and jeans flee the area around the time of the shooting and run "in a southwesterly direction towards the projects." Officer Smith decided to drive up one of the streets leading in that direction in an effort to intercept the individual. He testified that he drove through the area without activating his lights and sirens because he did not want to announce his presence before he had a chance to see anyone who might be running.

{¶13} As he was driving, Officer Smith saw a black male walking south on Pole Avenue. He testified that the man crossed West 19th Street and was going to continue south on Pole Avenue, but then he "[j]ust kind of stopped, turned back around and walked in the opposite direction" until he was walking west on West 19th Street. Officer Smith testified that the manner in which the man changed directions as he approached led him to suspect that the man might be involved in the shooting. Accordingly, although the man was wearing jeans and a black t-shirt instead of a black, hooded sweatshirt, Officer Smith decided to stop him. Officer

Smith testified that he did not observe anyone else in the area who remotely matched the description of the runner and that West 19th Street and Pole Avenue are "[d]irectly on a southwest diagonal" from where the shooting occurred. Officer Smith notified two nearby officers that he was going to stop the man, and they quickly arrived to offer assistance.

{¶14} Officer Smith stopped the man, asked him to place his hands on his head, and performed a pat down. The man complied with Officer Smith's requests and identified himself as Mr. McLemore. Officer Smith testified that he thought Mr. McLemore appeared "[v]ery slightly" winded as he patted him down, but that he was focused more on the pat down than Mr. McLemore's breathing. He indicated that one of the other officers who had responded to aid him, Detective Smith, commented that Mr. McLemore was "out of breath" when they encountered him. Officer Smith noted that Mr. McLemore only had on a t-shirt, despite the fact that it was cold outside. He also noted that Mr. McLemore's t-shirt was dry even though it had been "stead[ily] rain[ing] * * * all day to that point." Only the legs of Mr. McLemore's jeans were wet.

{¶15} Officer Smith asked Mr. McLemore where he was walking from, and Mr. McLemore told him that he was coming from his girlfriend's house at West 19th Street and Long Avenue. He could not, however, give Officer Smith his girlfriend's last name or her address. Officer Smith testified that he did not believe Mr. McLemore's statement about having walked from his girlfriend's house because Mr. McLemore's shirt was dry and it was raining enough that his shirt would have been wet, had he walked that far.

{¶16} Officer Smith testified that he placed Mr. McLemore in his cruiser to detain him because his story was not matching up with Officer Smith's observations. Officer Smith asked Mr. McLemore if he had heard a shooting in the area or if he had seen anyone running, but Mr.

McLemore answered no to both questions. Officer Smith agreed that, during the detainment, Mr. McLemore asked how long it would be before he could go and stated that he wanted to leave. He also did not dispute that Mr. McLemore was handcuffed while being detained.

{¶17} Subsequently, Officer Smith drove Mr. McLemore to West 17th Street and Ashland Avenue to see if Mr. Brewer, the caller who had reported the shooting, could identify him as the black male he saw running from the area. The show-up took place at approximately 12:49 p.m. Officer Smith testified that he was not aware of the results of the show-up at the time it took place because a different officer conducted it. Sometime after the show-up occurred, however, Officer Smith was instructed to transport Mr. McLemore to the police station.

{¶18} Lieutenant Mark Carpentiere testified that he had already started the investigation at the scene of the shooting when he learned that Mr. McLemore was being detained by Officer Smith. He directed Officer Smith to bring Mr. McLemore to West 17th Street and Ashland Avenue. After Mr. McLemore arrived, another officer conducted a show-up wherein Mr. Brewer was asked to see if Mr. McLemore resembled the man he had seen running from the area of the shooting. Lieutenant Carpentiere testified that he did not conduct the show-up, but was informed of its results. Specifically, he was told that Mr. Brewer believed Mr. McLemore was taller than the man he had seen running away.

{¶19} Some indeterminate amount of time after the show-up occurred, Lieutenant Carpentiere ordered Officer Smith to transport Mr. McLemore to the police station. Lieutenant Carpentiere testified that, "by the time we had [Mr. McLemore] transported, the [hooded sweatshirt] had been found and he was a possible suspect in this shooting." He elaborated that a black, hooded sweatshirt was found on West 18th Street, "in between where the scene was and where the projects were where we believed he was heading southwest of the scene." Officer

Smith specified in his testimony that the sweatshirt was found "[p]retty much right around the corner from where [he] was" when he stopped Mr. McLemore on West 19th Street. Lieutenant Carpentiere interrogated Mr. McLemore at the police station after Mirandizing him. The interrogation began at 2:09 p.m.

{¶20} The trial court determined that, at the point that Mr. McLemore was taken to the police station, he was under arrest for Fourth Amendment purposes. The State maintains that the court erred in its legal determination because Mr. McLemore was not under arrest until after he confessed to the crime at the police station. The State argues that, up until the point when Mr. McLemore confessed, he was still under investigative detention.

{¶21} "If [a] detention exceeds the bounds of an investigatory stop, it may be tantamount to an arrest." *State v. Snyder*, 9th Dist. Medina No. 06CA0018-M, 2006-Ohio-6911, ¶ 13.

> There is no doubt that at some point in the investigative process, police procedures can qualitatively and quantitatively be so intrusive with respect to a suspect's freedom of movement and privacy interests as to trigger the full protection of the Fourth and Fourteenth Amendments. * * * [T]he line is crossed when the police, without probable cause or a warrant, forcibly remove a person from his home or other place in which he is entitled to be and transport him to the police station, where he is detained, although briefly, for investigative purposes. * * * [S]uch seizures, at least where not under judicial supervision, are sufficiently like arrests to invoke the traditional rule that arrests may constitutionally be made only on probable cause.

(Citations omitted.) *Hayes v. Florida*, 470 U.S. 811, 815-816 (1985).

{¶22} This Court has recognized that, while conducting an investigatory detention based upon reasonable suspicion, the police may place an individual in the back of a police cruiser and handcuff an individual for safety purposes without offending the Fourth Amendment. *See State v. McCraney*, 9th Dist. Medina No. 09CA0079-M, 2010-Ohio-2667, ¶ 5-17; *Snyder* at ¶ 13. Those situations, however, are materially distinct from the situation at hand. The evidence

presented at the suppression hearings was that Mr. McLemore was transported to the police department, in handcuffs, and against his will, as a potential suspect in a shooting. There was no reason to transport him to the police station, other than that the police considered him a suspect at that point. *Compare State v. Ha*, 9th Dist. Medina No. 07CA0089-M, 2009-Ohio-1134, ¶ 15-20 (no arrest when defendant handcuffed, read *Miranda* rights, and transported to the police station because defendant and several related individuals were not fluent in English and required an interpreter at a central location); *State v. Hillman*, 9th Dist. Wayne Nos. 07CA0048 & 07CA0049, 2008-Ohio-3204, ¶ 27-30 (no arrest when defendant transported to police station for strip search because it was impracticable for the search to take place at defendant's current location). Mr. McLemore understood that he was not free to leave and was subject to an actual seizure under the authority of the Lorain Police Department. *See Barker*, 53 Ohio St.2d 135, at paragraph one of the syllabus. As such, the trial court did not err by concluding that Mr. McLemore was under arrest at the time he was transported to the police station. *See Akron v. Kulasa*, 9th Dist. Summit No. 19815, 2000 WL 353987, *2-3 (Apr. 5, 2000). The remaining issue is whether the police had probable cause to arrest him at the time of transport.

{¶23} "A warrantless arrest by an officer who does not have probable cause at the time of the arrest is constitutionally invalid." *State v. Finney*, 9th Dist. Summit No. 21180, 2003-Ohio-529, ¶ 18.

> Probable cause arises when "the facts and circumstances within [a police officer's] knowledge and of which [he has] reasonably trustworthy information were sufficient in themselves to warrant a man of reasonable caution in the belief" that criminal conduct was afoot. *Carroll v. United States*, 267 U.S. 132, 162 (1924). If, after being arrested, a defendant asserts that probable cause was lacking at the time of arrest, the state bears the burden of proof on the issue of whether probable cause existed at the time of arrest. *Xenia v. Wallace*, 37 Ohio St.3d 216 (1988), paragraph two of the syllabus.

*State v. Davis*, 9th Dist. Lorain No. 03CA008228, 2003-Ohio-5900, ¶ 21. "Suppression of evidence obtained as a result of a Fourth Amendment violation follows as a corollary to protecting rights under the Fourth Amendment." *State v. Murphy*, 159 Ohio App.3d 74, 2004-Ohio-5817, ¶ 5 (9th Dist.).

{¶24} The trial court determined that the police lacked probable cause to arrest Mr. McLemore at the time they transported him to the station. The court reasoned that Mr. Brewer's failure to identify Mr. McLemore as being "at least similar to the individual he saw" running "negate[d]" any basis the police had to suspect Mr. McLemore's involvement in the shooting. Although the court stated that the police could have continued to detain Mr. McLemore after the show-up for a variety of reasons, the court held that there was no probable cause to arrest him. The court elaborated that there was "no evidence before this Court that at the time that [Mr. McLemore] was * * * transported [] to * * * the police department * * * the Lorain Police had * * * discovered the * * * the sweatshirt or any gun, nor that they had any eyewitness to the incident * * *." The court ruled that all of the evidence the police obtained from Mr. McLemore following his illegal arrest was inadmissible as a result of the Fourth Amendment violation.

{¶25} "This Court must only accept the trial court's findings of fact if they are supported by competent, credible evidence." *State v. Figueroa*, 9th Dist. Lorain No. 09CA009612, 2010-Ohio-189, ¶ 20. Lieutenant Carpentiere specifically testified that the Lorain Police Department recovered the black, hooded sweatshirt on West 18th Street before Mr. McLemore was transported to the police station. Accordingly, the trial court's finding that there was no evidence the sweatshirt had been discovered at the time of Mr. McLemore's arrest is not based on competent, credible evidence. Moreover, the record calls several of the trial court's legal

conclusions into question. *See Tallmadge v. Barker*, 9th Dist. Summit No. 24414, 2009-Ohio-1334, ¶ 16-19.

{¶26} The trial court found that Mr. Brewer's inability to identify Mr. McLemore as the man he had seen running "negate[d]" any basis the police had to suspect Mr. McLemore was involved in the shooting. Mr. Brewer testified, however, that he told Lieutenant Carpentiere before the show-up that he never saw the face of the man who ran because the hood of the man's sweatshirt was pulled up. He also told Lieutenant Carpentiere that he saw the runner from 50 to 75 feet away and that the man was "hunkered over" as he ran. The only statement Mr. Brewer made to the police as a result of the show-up was that Mr. McLemore seemed too tall to be the runner. Given the limited amount of identifying features Mr. Brewer observed and the distance at which he observed them, we do not agree that his statement that Mr. McLemore seemed too tall "negate[d]" any basis the police had to suspect Mr. McLemore's involvement in the shooting.

{¶27} At the time the police arrested Mr. McLemore, they knew that a black male wearing jeans and a black, hooded sweatshirt had fled the area of the shooting and was headed in a southwesterly direction. Officer Smith testified that he observed Mr. McLemore in an area southwest of where the shooting had occurred and that he was the only individual around who matched two aspects of the foregoing description. Further, he observed Mr. McLemore stop, turn around, and walk in a completely different direction when he came down the street in his marked police cruiser. Officer Smith testified that Mr. McLemore's behavior caused him to believe Mr. McLemore might be involved in the shooting.

{¶28} The State presented evidence that Mr. McLemore was wearing only a t-shirt in cold weather and that his t-shirt was dry in spite of the rain. Officer Smith testified that Mr.

McLemore's appearance raised questions in his mind because his t-shirt would have been wet if he had walked from his girlfriend's house, as he claimed. Indeed, Officer Smith observed that Mr. McLemore's pant legs were wet although his shirt was not. Officer Smith also testified that Mr. McLemore was unable to remember his girlfriend's last name or her address. Another officer, Detective Smith, also observed that Mr. McLemore was out of breath when the police first stopped him.

{¶29} By the time the police arrested Mr. McLemore, they found a black, hooded sweatshirt "right around the corner" from the location where Officer Smith stopped Mr. McLemore. Pairing the discarded sweatshirt with the dryness of Mr. McLemore's t-shirt and the wetness of his pant legs, a reasonable officer could have concluded that Mr. McLemore discarded the sweatshirt directly before he encountered Officer Smith. Additionally, given Mr. McLemore's shortness of breath and his difficulty in relaying his prior whereabouts, a reasonable officer could have concluded that he was the man Mr. Brewer saw running from the area of the shooting. Finally, a reasonable officer could have surmised that the reason Mr. McLemore had discarded his sweatshirt and was not clear about his prior whereabouts was that he was involved in the shooting that had occurred.

{¶30} "[T]here is no requirement that an arresting officer absolutely know, in fact, that the person arrested has committed a crime. Only probable cause is needed * * *." *State v. Gordon*, 9th Dist. Summit No. 26786, 2013-Ohio-4997, ¶ 10, quoting *State v. Noe*, 6th Dist. Fulton No. F-82-3, 1982 WL 6560, *4 (Sept. 3, 1982). Having reviewed the record, we must conclude that the trial court erred when it determined that the police did not have probable cause to arrest Mr. McLemore at the time they transported him to the police station. *See generally State v. Shinholster*, 9th Dist. Summit No. 25328, 2011-Ohio-2244, ¶ 10-11; *State v. Snyder*, 9th

Dist. Medina No. 06CA0018-M, 2006-Ohio-6911, ¶ 14-17. The State presented evidence that would "'warrant a man of reasonable caution in the belief' that criminal conduct was afoot." *Davis*, 2003-Ohio-5900, at ¶ 21, quoting *Carroll*, 267 U.S. at 162. Consequently, the State's second assignment of error is sustained.

## ASSIGNMENT OF ERROR I

THE TRIAL COURT ERRED IN GRANTING [MR.] McLEMORE'S MOTION TO SUPPRESS BASED ON ITS MISAPPLICATION OF THE LAW TO THE FACTS.

**{¶31}** In its first assignment of error, the State argues that the trial court erred in granting Mr. McLemore's motion to suppress because it failed to properly consider the totality of the circumstances in determining whether the police had probable cause to arrest Mr. McLemore. Based on our resolution of the State's second assignment of error, its first assignment of error is moot, and we decline to address it. *See* App.R. 12(A)(1)(c).

## III.

**{¶32}** The State's second assignment of error is sustained, and its first assignment of error is moot. The judgment of the Lorain County Court of Common Pleas is reversed, and the cause is remanded for further proceedings consistent with the foregoing opinion.

Judgment reversed,
and cause remanded.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellee.

JENNIFER HENSAL
FOR THE COURT

CARR, J.
WHITMORE, J.
CONCUR.

APPEARANCES:

DENNIS P. WILL, Prosecuting Attorney, and MARY R. SLANCZKA, Assistant Prosecuting Attorney, for Appellant.

PAUL GRIFFIN, Attorney at Law, for Appellee.